Harold CHAFFEE, Plaintiff,

v.

KRAFT GENERAL FOODS,
INC., Defendant.

Civ. A. No. 94–4765 (WHW).

United States District Court,
D. New Jersey.

May 11, 1995.

As Amended May 16, 1995.

Joseph R. Marinello, P.C., Fort Lee, NJ, for plaintiff, Harold Chaffee.

Christopher H. Mills, David H. Ganz (argued), Collier, Jacob & Mills, P.C., Somerset, NJ, for defendant, Kraft General Foods, Inc.

## OPINION

WALLS, District Judge.

The plaintiff, Harold Chaffee ("Chaffee") and defendant Kraft General Foods, Inc. ("Kraft") have submitted cross-motions for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, in this case brought by a former employee to recover severance pay allegedly, wrongfully withheld from him by his employer. For reasons stated below, summary judgment is granted in favor of the defendant, Kraft.

## Background

The origins of this imbroglio are found in Hoboken, New Jersey—the home of baseball, Frank Sinatra and the Maxwell House Coffee plant. While the present vitality of the first two institutions may be open to debate, the Maxwell House factory undeniably has ceased operations. This controversy relates to events pertaining to the effect of that factory's close-down upon Chaffee, a long-time employee.[1]

In 1968, Chaffee began his employment at Maxwell House's plant. Over time, his various positions included adjuster mechanic, maintenance foreman and packaging specialist.

In 1990, Maxwell House decided to phase out its operations at the Hoboken Plant by 1992. Naturally, this news could be expected to send the Hoboken Plant's laborers in search of new employment. To entice the Plant's employees to remain loyal and productive until activities actually ceased, Maxwell House developed the "Hoboken Closing Program—Salaried Employees" ("the Plan"). The Plan comprised a severance program and a stay-on bonus program.

The severance program required that,

In order to qualify for severance benefits under this program, the employee must be *actively employed* on the Final Date of Employment *identified by the Company* for his or her job. (emphasis added).

An employee who satisfied this requirement would receive one month's pay for each year of service to Maxwell House, up to a maximum of 24 months, which could be paid either in a lump sum or installments. The stay-on bonus part gave selected employees a bonus for continuing their employment at the Plant, if requested by Maxwell House, after its official cessation of operations in early 1992, to wind up operations and close the Plant. The bonus would be four months of the employee's base pay. The Final Date of active employment was subject to change; Maxwell House, when writing to advise an employee of his or her Final Date, stated

that the designated day could "change depending on business needs. We will notify you of any change at least 90 days in advance."

Chaffee remained a loyal worker from the time the announcement was made in 1990 to some time in 1992. He had also been asked to "stay-on" and participate in the close-down, and was notified by letter dated September 21, 1990 that his "Final Date" of employment would be April 1, 1992. Chaffee was charged with the duty of coordinating the intake and processing of outside contracts for environmental clean-up at the Plant. Maxwell House exercised its right to extend Chaffee's termination date more than once. In the company's letter of June 2, 1992, he was informed that his termination date would be October 1, 1992. Later, in an August 25, 1992 letter, his termination date was extended by Maxwell House to December 1, 1992.

In addition to his normal duties during his "stay-on" to close-down the Plant, Chaffee also engaged in extra-legal activities. Specifically, he became involved in a scheme to accept payments from contractors seeking to do jobs at the Plant, but who were ineligible because they employed non-union laborers. In a letter dated September 25, 1992 from Maxwell House Chaffee was informed that the company had learned that the FBI was investigating allegations of illegal acts done by Chaffee in his supervision of the Plant shut-down, and he, therefore, was being suspended from employment without pay. The letter further advised that if the investigation revealed Chaffee to be innocent of any wrongdoing, he would be reinstated with full back pay through October 1, 1992, and although his employment would be terminated on that date, he would receive benefits due under the Plan.

On October 29, 1993, Chaffee pled guilty before District Judge Jerome B. Simandle to an information charging him with conspiracy to commit mail fraud in violation of 18 U.S.C. § 371. At that proceeding, Chaffee admitted to the Judge that in early 1992, while over-

---

1. Maxwell House was a division of General Foods, USA, which in turn was an operating division of Kraft General Foods, Inc., the named defendant herein. This opinion refers to the defendant either as Kraft or as Maxwell House.

seeing contractors engaged in the removal of asbestos from the Hoboken Plant, he had arranged to receive $150,000.00 in exchange for hiring a contractor who employed non-union laborers, in contravention of Maxwell House's policies.

In its December 1, 1993 letter, Maxwell House had notified Chaffee that his employment was retroactively terminated as of September 25, 1992—the date on which he had been given notice of his suspension pending the FBI's investigation.

On February 4, 1994, pursuant to his guilty plea, the defendant Chaffee was sentenced by Judge Simandle. The transcript of those proceedings reveals that Judge Simandle stated that Chaffee had "played an important role in a very serious crime," and inquired of Chaffee's then counsel, in the presence of the defendant, "shouldn't there be some recognition of how serious that situation was and shouldn't that militate toward a short-term imprisonment for Mr. Chaffee?" Chaffee's counsel answered that his client's crime was an aberration in Chaffee's life, that he had treated his family well and had cooperated with the government in prosecuting others involved in the Maxwell House Plant close-down affair. Significantly, Chaffee's lawyer also represented that "he's also been, as a result of this, for his 25 years of service with Maxwell House, *he's lost two years of severance pay which is $90,000.00.*" (emphasis added).

The Judge did not sentence Chaffee to a custodial sentence. Instead, he imposed upon him three years probation, 750 hours of community service and a $2,500.00 fine. The Judge stated, among other things, that "I also know that you've suffered much already, separate and apart from anything this Court would do in imposing a sentence."

On September 30, 1994, Chaffee's counsel, who earlier had represented him before Judge Simandle, filed the instant suit seeking a recovery of Chaffee's severance and stay-on bonuses he claims Kraft wrongfully has

withheld from Chaffee. The complaint has three counts: Count One sounds in breach of contract; Count Two pursues punitive damages; and Count Three seeks attorneys' fees.

### Standard for Summary Judgment

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.1976), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

### Discussion/Analysis

Kraft seeks summary judgment on two grounds: (1) the earlier representations of Chaffee's attorney before the sentencing Judge in the criminal proceedings bar the present civil lawsuit; and (2) if the suit is not barred, Chaffee nevertheless is not entitled to the benefits of the Plan.

Kraft asks the Court to apply the doctrine of judicial estoppel to bar Chaffee's breach of contract claim. The Court agrees, and also suggests this case presents an example of "legal chutzpah" not often seen. As Leo Rosten observes, "chutzpah" is a Yiddish word defined as

> gall, brazen nerve, effrontery, incredible "guts"; presumption-plus-arrogance such as no other word, and no other language, can do justice to.

LEO ROSTEN, THE JOYS OF YIDDISH 92–93 (1968).[2] Legal chutzpah is not always unde-

2. *See*, David A. Nacht, *1992 Survey of Books Relating to the Law*, 90 MICH L.REV. 1802 (1992) (reviewing ALAN M. DERSHOWITZ, CHUTZPAH (1991), for a further discussion of "chutzpah"). "Chutzpah" had been, as of 1993, used in 112 reported cases, all but eleven of which were filed since 1980. *See generally*, Hon. Alex Kozinski & Eugene Volokh, *Lawsuit Shmawsuit*, 103 YALE L.J. 463 (1993) (explaining that this increase is the result, not of a dramatic augmentation of the

sireable, and without it our system of jurisprudence would suffer. Indeed, consider the chutzpah exhibited by Chief Justice John Marshall in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). *Marbury* established, among other things, the Supreme Court as the Constitution's authoritative interpreter with the power to judicially review actions of its co-equals, the executive and legislative branches of government, and declare their actions and statutes invalid, despite the absence in the Constitution of an explicit grant of such authority. Unfortunately for him, Chaffee's exercise in chutzpah falls short of the Chief Justice's success.

*Is Chaffee's Counsel's Statement an Admission?*

Before addressing Kraft's bases for summary judgment, the Court must determine whether the statement made by Chaffee's advocate, in his presence, is an admission, binding upon the client. *See,* 29A *Am.Jur.2d* § 770 at 138.

Wigmore recognizes and discusses the difference between what is a "judicial admission" and a more "ordinary or quasi-ordinary admission—which indeed does not deserve to bear the same name." 9 WIGMORE, EVIDENCE § 2588 (Chadbourn rev. 1981).

■ The latter variety of admissions consists of statements made by a party, or his agent, which are admissible against the party, for example, to point out inconsistencies in testimony to the trier of fact. *See, United States v. McKeon,* 738 F.2d 26, 30 n. 3 (2nd Cir.1984); Fed.R.Evid. 801(d)(2). Hence, if a defense lawyer makes a factual assertion in her opening statement to a jury, and then in a second trial she makes an inconsistent opening declaration, the prosecution may be entitled to introduce the first statement into evidence against the defendant, as an admission of a party. *Id.* Any significance of the admission, for example, as evidence that the defendant's present version of events is a fabrication, is for the trier of fact to determine.

■ However, the judicial variant is more formal, and a party making such must abide a correspondingly more significant result. A judicial admission is

An express waiver made in court or preparatory to trial by the party or his attorney conceding for the purposes of the trial that the truth of some alleged fact, has the effect of a confessory pleading, in that the fact is thereafter to be taken for granted; so that the one party need offer no evidence to prove it and the other is not allowed to disprove it.

9 WIGMORE, EVIDENCE § 2588 (Chadbourn rev. 1981).

■ Chaffee's lawyer's statement that "he's lost two years of severance pay which is $90,000.00," is more appropriately deemed a "garden-variety" admission of a party, rather than a judicial one which would conclusively preclude Chaffee's present suit.

*Is Chaffee's Suit Barred by Judicial Estoppel?*

Therefore, the Court must next determine the merit of Kraft's contention that Chaffee's suit is barred by the doctrine of judicial estoppel, because of the admission of Chaffee's counsel to Judge Simandle.

Here, Chaffee asserts a legal position which directly contradicts one he maintained earlier. Chaffee plead guilty to the federal crime of conspiracy to commit mail fraud. At the time of sentencing, when the Judge asked why a six month imprisonment should not be imposed, Chaffee, through counsel, represented, among other things, that he had "lost two years of severance pay which is $90,000.00."

■ The doctrine of judicial estoppel precludes a party from assuming a position in a legal proceeding that contradicts, or is inconsistent with, a previously asserted position. *See,* 18 C. Wright, A. Miller & E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 4477 (1981). According to the Court of Appeals for the Third Circuit, the doctrine "looks to the connection between the litigant and the judicial system, preserving the integrity of

---

actual amount of chutzpah in the United States' legal system, but rather, because "Yiddish is

quickly supplanting Latin as the spice in American legal argot.").

the courts by preventing litigants from 'playing fast and loose with the courts.'" *See, Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107 (3d Cir.1992) (citing *Scarano v. Central R.R. Co.,* 203 F.2d 510 (3d Cir.1953) (other citations omitted)); *see generally,* 18 Wright, Miller & Cooper § 4477 (1981). It applies when "intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice." *Scarano,* at 513.

■ The doctrine of judicial estoppel relates to assertions of a party's legal counsel, as well as those of the party. An admission made by a party's attorney in an argument to the court is ample basis for application of the doctrine. *See, AFN, Inc. v. Schlott, Inc.,* 798 F.Supp. 219, 224 (D.N.J.1992) (citing *Lewandowski v. National Railroad Passenger Corp.,* 882 F.2d 815, 819 (3d Cir.1989)).

Now, Chaffee seeks a recovery of the same sum which his lawyer earlier had told a Judge had been "lost." Plainly, Chaffee's present assertion completely counters that previously advanced. Chaffee contends that his claim should not be judicially estopped.

Chaffee argues that estoppel does not obtain because he did not "assert" the position that he was not entitled to severance benefits at the sentencing hearing. He claims that issue was not before the sentencing Judge, nor is there any evidence that his admission had any affect on the Judge's decision not to impose a jail term. Chaffee claims that the Judge's decision was pursuant to a plea agreement reached with the U.S. Attorney's Office before the hearing, so the statement could not have influenced the Judge.

The Court finds that Chaffee "asserted" that he was not entitled to the severance benefits at the sentencing hearing. His lawyer said so. Admittedly, Chaffee's entitlement to Maxwell House's benefits was not a legal issue that the sentencing Judge was required to adjudicate; the sole purpose was to determine an appropriate sentence for Chaffee, who had pled guilty. The applicable sentencing guidelines allowed the Judge to impose a six month prison term. The Judge asked why such a term should not be ordered, and Chaffee raised the loss of the severance benefits. The Judge did not ask him whether he still was qualified to receive the benefits; Chaffee, by his lawyer, inserted that circumstance into the hearing. He therefore is bound by its consequence.

■ Finally, the Court rejects Chaffee's contention that his statement could not have influenced the sentencing Judge because the determination of his sentence was the result of a plea bargain agreement with the United States Attorney. There is no requirement that the party against whom the estoppel is sought prevail when the inconsistent position was advanced earlier. *AFN v. Schlott, Inc.* at 227. Moreover, this argument supposes that the District Judge's function in sentencing is to merely affix a rubber stamp upon the government's proposed sentence. The Court would not require a sentencing hearing that is in reality no more than an empty formality. At the sentencing hearing, Chaffee was invited to memorialize any facts militating against a term of incarceration. He could have chosen to give any reason. He pointed to his loss of two-years severance benefits. Nor did he claim that Maxwell House was wrongfully withholding the benefits, even if that is what he believed. It benefited Chaffee for the sentencing Judge to believe that Chaffee was suffering from his acts irrespective of any sentence meted, and the Judge accepted Chaffee's representation.

■ Chaffee is judicially estopped from asserting the gravamen of his complaint that he is entitled to severance benefits. A party must not be permitted to "play fast and loose with the courts" by asserting one position when faced with a criminal penalty, then a contrary one when later seeking a civil remedy.

This position coincides with that of a recent decision in another district. *Peoples Bank of Dickson v. Duke,* 172 B.R. 575 (M.D.Tenn.1994), bears great factual similarity to ours. Duke worked as a cashier for a Bank from 1984 through 1989. She committed acts of fraud in obtaining $308,700.00 from the Bank, and became indebted to the Bank for that amount. To repay her obligation, Duke sold her house and made a claim on her surety bond. After those ef-

forts, Duke still was indebted to the Bank in the amount of $14,159.00.

■ The following civil and criminal judicial proceedings ensued. Civilly, on January 12, 1993, Duke filed for Chapter 7 personal bankruptcy, seeking a judicial discharge of the remaining debt to the bank. Criminally, a month later, on February 8, 1993, Duke pled guilty to the crime arising out of the fraud. On April 9, 1993, the Bank filed an adversary proceeding in the bankruptcy court, objecting to any discharge of Duke's indebtedness. On June 21, 1993 a hearing in Duke's criminal proceeding was held to determine whether Duke would be required to make restitution payments to the Bank.[3] At the restitution hearing, Duke represented that she should not be required to pay the Bank restitution because, notwithstanding her Chapter 7 proceeding, she would not be receiving a discharge of the $14,159.00 debt which she owed the Bank, pursuant to an agreement reached by the parties. The sentencing court did not impose upon her the sanction of restitution payments. Approximately 5 months later, Duke filed and won a motion for summary judgment in the Bank's adversary proceeding in Bankruptcy Court, claiming that her debt to the Bank should be discharged. On appeal, the district court reversed the grant of the motion and held that Duke, by virtue of her earlier representation at the restitution hearing, was estopped from denying the non-dischargeability of her debt.

Chaffee points out the dissimilarities between his case and *Duke*. However, common facts predominate: (i) Duke, like Chaffee, pled guilty to a crime; (ii) Duke, like Chaffee, appeared at a criminal sentencing proceeding; (iii) Duke, like Chaffee, made a factual representation to the sentencing Judge as to why a particular sentence should not be imposed; (iv) Duke, like Chaffee, did not receive the sentence proposed and objected to; and (v) Duke, like Chaffee, thereafter asserted, in a civil proceeding, a position directly contrary to that taken at the criminal sentencing.

So ends the discussion of chutzpah.

*Is Chaffee Entitled to Severance and Stay–On Benefits*

Turning to the substance of Chaffee's complaint, the Court finds that he is not entitled, in any event, to the benefits he seeks.

■ The question of whether Chaffee is entitled to receive the benefits he seeks is governed by the clear and unambiguous terms of the Plan, which in relevant part state,

> In order to qualify for severance benefits under this program, the employee must be *actively employed* on the Final Date of Employment *identified by the Company* for his or her job. (emphasis added).

The promise of Maxwell House to pay Chaffee the benefits is predicated upon the occurrence of the condition he be "actively employed" on a date specified by the company. Chaffee's active employment on the pre-determined termination date is a condition precedent to his right to receive severance benefits. Maxwell House has no obligation to fulfill its promise until the condition is met. *See, First Atlantic Leasing Corp. v. Tracey*, 738 F.Supp. 863, 867 (D.N.J.1990) (citing *American Handkerchief Corp. v. Frannat Realty Co.*, 17 N.J. 12, 20, 109 A.2d 793 (1954)).

By a letter of September 21, 1990, Maxwell House first established Chaffee's Final Date to be April 1, 1992. Thereafter, Maxwell House by June 2 and August 25, 1992 letters exercised its right to extend Chaffee's Final Date to October 1, 1992 and December 1, 1992, respectively.

Chaffee does not dispute these, or any, essential facts adduced by Maxwell House. Indeed, he reasons that they require summary judgment in his favor.

Chaffee argues that Maxwell House breached the conditions imposed by Plan by "unilaterally changing the terms of the contract established." Chaffee interprets the

---

**3.** Restitution payments are punitive in nature, imposing a financial obligation separate and apart from any civil liability. *Kelly v. Robinson*, 479 U.S. 36, 52, 107 S.Ct. 353, 362, 93 L.Ed.2d 216 (1986).

Plan's language differently from Maxwell House. Again the relevant passage:

In order to qualify for severance benefits under this program, the employee must be *actively employed* on the Final Date of Employment *identified by the Company* for his or her job. (emphasis added).

Chaffee admits that Maxwell House had the right to establish his Final Date. This, he states, was fixed in Maxwell House's initial September 21, 1992 letter, which established an April 1, 1992 Final Date. Chaffee claims that his right to severance pay "vested" on that date, when he undeniably was actively employed. According to Chaffee, Maxwell House had no right, under the Plan, to unilaterally change his Final Date, once established, and once he had reached that date while actively employed.

The terms of the Plan are clear and unambiguous. They give Maxwell House the right to identify the employee's Final Date. There is no provision which limits Maxwell House's ability to amend the Final Date, nor any obligation to obtain an employee's consent to do so. Moreover, in the September 21, 1990 letter which demarcated the April 1, 1992 date, Maxwell House expressly advised Chaffee that his Final Date, "[could] change depending on business needs." The Court finds that Maxwell House had the unilateral right to extend Chaffee's Final Date.

■ Chaffee alternatively argues that, even if Maxwell House had the right to modify his Final Date, he nevertheless is entitled to receive severance pay. He claims that Maxwell House's December 1, 1993 letter—which informed him of his retroactively-applied September 25, 1992 termination date—established September 25, 1992 as his final date of employment, qualifying him for severance benefits as of that date. Chaffee claims that the December 1, 1993 letter not only established September 25, 1992 as Chaffee's termination date, but also determined that date to be his "Final Date." This argument is meritless. The December 1, 1993 letter did not purport, either explicitly or implicitly, to alter Chaffee's Final Date of employment. It merely determined his last day of work. The December 1, 1993 could not have amended Chaffee's Final date with-

out explicitly doing so, as Maxwell House had done a number of times before.

■ Chaffee offers a final argument in support of his claim for severance benefits. He avers that his "Final Date" was

the date his job duties changed from those he had during the operation of the plant to those he had during the closing of the plant.

When the Maxwell House plant was in operation, Chaffee's duties were those of "maintenance supervisor/foreman." After the plant stopped production, during the "stay-on" period, Chaffee worked a different job. Specifically, he coordinated the intake and processing of outside contracts for environmental clean-up at the plant. Chaffee contends that the Final Date, for purposes of determining when his right to severance benefits vested, was when his "job ended" while the vesting date for the "stay-on" benefits was the arbitrarily picked "Final Date." Chaffee argues that the same date could not satisfy the two different functions.

The Court cannot accept Chaffee's assertion, because it requires the insertion of a condition into the Plan which is not present. The Plan requires an employee to be "actively employed" on his "Final Date," as determined by Maxwell House. Chaffee would have the Court read into that clear sentence, a modifying clause, "in the position that employee occupied on the date the Hoboken Plant ceased production." Chaffee offers no factual support for such a graft. The Court may not go beyond the clear provisions of the Plan, which contain no such qualification.

■ To be entitled to severance benefits under the Plan, Chaffee had to have been "actively employed" on his Final Date. Maxwell House's August 25, 1992 letter to Chaffee established that date to be December 1, 1992. However, Chaffee was informed by a September 25, 1992 letter that he was being suspended without pay pending the FBI's investigation. After the investigation resulted in Chaffee's guilty plea, Maxwell House terminated Chaffee, retroactive to the September 25, 1992 date.

When the page on Chaffee's calendar revealed his Final Date—December 1, 1992—he was not "actively employed." Rather, he had been terminated long before. (Obviously, he had not been vindicated of the charges which would have allowed him to shelter under a Final Date of October 1, 1992, pursuant to Maxwell House's September 25, 1992 letter.) Maxwell House's obligation to pay severance benefits therefore was extinguished by this failure of a condition precedent.

### Conclusion

Chaffee spent many years working at the Maxwell House Coffee Plant in Hoboken, New Jersey. His tenure ended when he plead guilty to a federal crime committed during the Plant's close-down operations. As a result of his guilty plea, Chaffee faced the prospect of serving six months in federal prison. When the sentencing judge asked Chaffee and his attorney why such a sentence should not be imposed, his attorney answered that, among other reasons, he had already suffered greatly, having surrendered two years' severance benefits worth $90,-000.00. The Judge did not send Chaffee to prison. Chaffee brought the instant suit seeking the afore-mentioned severance benefits. The Court cannot permit Chaffee to "play fast and loose" with the judicial system by asserting such inconsistent positions. The Court holds that Chaffee's present suit is precluded by judicial estoppel.

Moreover, Chaffee is not entitled to the benefits he seeks, under the clear and unambiguous terms of the governing contract. To be so entitled, an employee was required to satisfy the condition precedent of being "actively employed" on his "Final Date" of employment, as determined by Maxwell House. Put simply, Maxwell House exercised its option to change the date, and Chaffee was not employed on the relevant date.

Therefore, Kraft's motion for summary judgment is GRANTED and Chaffee's motion for summary judgment is DENIED. Chaffee's complaint is dismissed. An appropriate order follows.

### ORDER

This matter having been opened to the Court on motion of Defendant Kraft General Foods, Inc. for summary judgment, and this Court having considered the briefs submitted in support and in opposition thereto, and having heard oral argument, and good cause appearing therefor:

It is this 11th day of May, 1995,

ORDERED that Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure be and hereby is granted; and the motion of plaintiff for summary judgment denied; and

IT IS FURTHER ORDERED that plaintiff's Complaint be and hereby is dismissed in its entirety and with prejudice.