**John BARONE, Plaintiff,**

v.

**GARDNER ASPHALT CORPORATION, Defendant.**

**Civ. No. 95–2887 (JAG).**

United States District Court, D. New Jersey.

Feb. 21, 1997.

John Barone, Dunellen, NJ, pro se.

Marie A. Latoff, Hannoch Weisman, Roseland, NJ, for defendant.

## OPINION

GREENAWAY, District Judge.

This matter comes before the Court on the motion for summary judgment of Hannoch Weisman, attorneys for Gardner Asphalt Corporation ("Gardner Asphalt").

### FACTS

Defendant Gardner Asphalt is in the business of manufacturing and wholesaling products for use in the roofing industry. Plaintiff John Barone worked for Gardner Asphalt from approximately March 1986 until December 9, 1994. Mr. Barone's Complaint alleges that his former employer, Gardner Asphalt, wrongfully terminated his employment in breach of an alleged employment contract (Count One), discharged him solely because of his age (Count Two), owed him a bonus based on his performance from September 1, 1993 through August 31, 1994 (Count Three) and owed him compensation for fifteen days of vacation time accrued but never taken (Count Four).

The following facts are relevant to Mr. Barone's claims against Gardner Asphalt: In approximately March 1986, Mr. Barone received an offer from Mr. Raymond Hyer, Chairman of the Board and Chief Executive Officer of Gardner Asphalt, as an at-will employee.[1] Mr. Barone accepted the position. There is no evidence in the record to suggest that either party discussed a specific term of employment or that the parties executed or contemplated executing an employment contract.[2] There is also no evidence that any representative of Gardner Asphalt made any statements that Mr. Barone could only be terminated for cause. In addition, Mr. Barone admitted at his deposition that at least until December 13, 1994, Gardner Asphalt employed him as an at-will employee.

Initially, Mr. Barone worked directly for Mr. Hyer in the Emulsion Products Division and performed a variety of jobs. After approximately two years, Mr. Barone became more involved in sales and moved from the Emulsion Products Division to the main payroll of Gardner Asphalt. In 1990, Mr. Barone received a promotion to regional sales manager. As regional sales manager, Mr. Barone's main responsibility focused on increasing business for Gardner Asphalt.

Beginning in the late 1980s and continuing through the 1990s, the building industry, and thus the roofing products market, was depressed.[3] Indeed, Mr. Barone admitted that the building roofing material market was in dire straits prior to his termination: at his deposition, sworn to on February 9, 1996, he testified that "[t]he building roofing materials market was totally depressed, oh, God, for the last three or four years ..." Barone Dep. at 127, 20–22; see also Latoff Certif., Ex. D, at 127.

At the annual conference for regional sales managers held in January 1994, top management, acknowledging that action was necessary to combat the depressed market, directed its regional managers to develop a long-term strategic plan to increase sales. The regional managers also received instructions to contact the existing customer base to reinforce relations, to foster the dedication of the

---

1. During the years 1981 through 1986, prior to accepting the position with Gardner Asphalt in 1986, Mr. Barone had worked for one of Gardner Asphalt's suppliers, Trumball Asphalt.

2. Gardner Asphalt's intent to hire Mr. Barone as an at-will employee is also clearly expressed in its Personnel Policy Manual. Under Policy 103:1 of this Manual, entitled "Employment At–Will," it states that it is "the policy of the company that all employees who do not have a written employment agreement are employed at the will of the

company for an indefinite period. Employees may resign from the company after prior notice and may be terminated by the company at any time for any reason, and with or without cause." Latoff Certif., Ex. M. On November 11, 1987, Mr. Barone signed an "Acknowledgment", stating that he had received the Gardner Asphalt Personnel Policy Manual on that day. Latoff Certif., Ex. M.

3. In 1992, Gardner Asphalt filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

sales force and to write a job description for the district managers, as soon as possible. Mr. Barone failed to comply with these directives. Mr. Hyer also continued to receive complaints from customers, his sales force and other top managers of Gardner Asphalt that Mr. Barone failed to respond to their messages, to call the national office, or to inquire about the problems that needed his immediate attention. In addition, Mr. Barone failed to submit schedules, sales receipts and expense reports in a timely manner. In October 1994, approximately two months prior to Mr. Barone's termination on December 19, 1994, Gardner Asphalt lost the Channel, United Asphalt, and Seaboard Supply Co. accounts. These northeast regional customers, for which Mr. Barone had direct responsibility, constituted the vast majority of the northeast region's business.[4] Indeed, Mr. Barone had failed to develop any new customers over the last two years of his employment. Hyer Certif. ¶ 30.

Gardner Asphalt believed that Mr. Barone (1) performed his job unsatisfactorily, (2) caused the loss of the Channel and other accounts and (3) brought about a general decline in the profitability of the northeast region. As a result, Mr. Hyer, along with Edwin Plemons, Chief Operations Officer, and Michael A. Bell, Vice President of National Sales, decided to terminate Mr. Barone.

On December 13, 1994, Mr. Bell met with Mr. Barone at the Kearney, New Jersey office. In preparation for this meeting, Mr. Bell spelled out Mr. Barone's deficiencies in a memorandum to Mr. Barone, entitled "Re: Conditions of Employment", (hereinafter, the "Memorandum"). This Memorandum states in its entirety:

> As the Vice President of National Sales for Gardner Asphalt Corp., it is my responsibility to ensure timely communications to and from the field sales force; prompt T & E expense reporting; and organized growth of our product sales into all segments of our target markets. In this vein, you are required to comply with the following procedures.
>
> · You are to check your voice mail a minimum of three times daily, no later than the following times: 9:00 AM; 1:00 PM and 3:30 PM.
>
> · During these calls you are to check with Tami Watson to determine if you are needed to answer any questions or resolve any problems in your area of responsibility.
>
> · All matters requiring your input, action or attention are to be handled immediately without delay.
>
> · Expense reports are to be completed and on my desk no later than seven (7) working days after the week ending date.
>
> · Any entertainment expenses exceeding $50.00 must be approved by me in advance.
>
> · A formal business plan outlining Target Accounts by sales person, dollar volume, lost business and a strategic plan on how to grow our business in a planned and organized manner in 1995 must be on my desk no later than 12–31–94.
>
> · Establish a realistic plan to replace the sales volume lost at Channel Home Centers. Due date 12–31–94.[5]
>
> · A daily work schedule, updated weekly, portraying account calls, goals and expected results of the call with buyers [sic] name and phone number is to be submitted monthly. Due date is the last working day of the month.
>
> Failure to comply with any or all of the above conditions may result in your immediate dismissal.

Latoff Certif., Ex. J. At no time did Mr. Bell state or imply to Mr. Barone that this Memorandum was an employment contract or that it curtailed Gardner Asphalt's right to terminate Mr. Barone with or without cause.[6]

---

4. The Channel account alone generated approximately $2 million in sales per year for Gardner Asphalt and accounted for 70% of the business in the northeast region.

5. Per Mr. Barone's request at the December 13, 1994 meeting, Mr. Bell changed both the December 31, 1994 dates to January 15, 1995.

6. Mr. Barone alleges that when Mr. Bell gave him the Memorandum he asked whether it had

Nothing in the Memorandum states that Mr. Barone's employment was for any specific duration, that he could not be terminated at any time or that his status as an at-will employee was otherwise altered in any way. In addition, nowhere in the Memorandum does it state that compliance with these requirements will guarantee employment for any specific duration.

Subsequent to giving Mr. Barone this Memorandum, Mr. Bell asked Mr. Hyer to give Mr. Barone another chance. However, Mr. Hyer did not want to do this and instructed Mr. Bell to terminate Mr. Barone immediately.[7] As a result, Mr. Bell informed Mr. Barone of his termination on December 19, 1994.

When Gardner Asphalt hired Mr. Barone, he was 45 years old. When terminated, Mr. Barone was 54 years old. The other three regional managers employed at the time of Mr. Barone's firing—Glenn Loyster, Stephen Crone and Paul Jacka—were 60, 47 and 45 years of age, respectively.[8] In addition, of Gardner Asphalt's 220 current employees, 121 are 40 years of age or older and 61 are 50 years of age or older. After his termination, Mr. Barone spoke to several former and present employees of Gardner Asphalt regarding his firing. During his deposition, Gardner Asphalt questioned Mr. Barone about the content of these conversations. Mr. Barone responded that he had not mentioned to any of these individuals that he believed the reason for his termination was age discrimination. Mr. Barone also admitted during his deposition that he did not recall anyone at Gardner Asphalt commenting about his age.

In early 1994, Gardner Asphalt sent out an "Intercompany Memo", announcing their new bonus program, which was designed to motivate its sales force and to increase sales. In his Complaint, Mr. Barone alleges that he is due a bonus in the amount of $7,200 based on his performance at Gardner Asphalt from September 1, 1993 through August 31, 1994.[9] Gardner Asphalt claims that the reason it did not give Mr. Barone a bonus is that the bonus program was a discretionary program paid to employees who significantly contribute to an increase in the sales of Gardner Asphalt. According to Gardner Asphalt, in 1993 and 1994, Mr. Barone did not maintain existing accounts, much less generate any new ones.

However, the Gardner Asphalt "Intercompany Memos" from David Robertson, dated January 19, 1994 and February 1, 1994 clearly indicate that the bonus program at Gardner Asphalt was not discretionary and indeed was nothing more than a straight mathematical calculation based on an individual's quota sales. *See* Barone Certif., Ex. 3 and Latoff Certif., Ex. P. In addition, the Certification from Richard Thurston, who was Mr. Barone's contact at Channel, provides evidence that Mr. Barone contributed to increased sales at Gardner Asphalt during its 1993–94 fiscal year.[10] Specifically, Mr. Thurston stated that "[b]ecause of Mr. Barone's efforts for Gardner Asphalt, which resulted in a annual sales increase of approximately 35% for 1993,

been approved by "Tampa" (the national office) and Mr. Bell responded that it had. Mr. Barone asks the Court to infer from this colloquy that Mr. Bell had intended the Memorandum to serve as some sort of employment extension or contract.

7. Gardner Asphalt hired Mr. Bell on approximately December 1, 1994. As a consequence, Mr. Bell had no familiarity with Mr. Barone's past performance at Gardner Asphalt.

8. It should also be noted that after Mr. Barone's termination, Mr. Bell, already Vice President of National Sales at Gardner Asphalt, assumed responsibility for sales in the northeast, i.e., Mr. Barone's job. Ultimately, management merged the northeast region with portions of the Mid-

west to form a new region. The regional manager residing in Pittsburgh, Pennsylvania began managing this redefined area, which included new and different duties. Although Gardner Asphalt admits that this regional manager was 43 years old, and therefore younger than Mr. Barone, Gardner Asphalt asserts that the new manager's skills and motivation were superior to those of Mr. Barone.

9. Gardner Asphalt instituted a new bonus program to run during the fiscal year, which ran from September 1, 1993 through August 1, 1994.

10. The Certification of Richard Thurston, sworn to in November 1996, is submitted "in support of Plaintiff's, John Baroné, Defense of Summary Judgment."

Gardner Asphalt was recognized by Channel Home Centers as 'vendor of the year.' "

Gardner Asphalt's vacation policy, in effect at the time of Mr. Barone's initial hiring, provided two weeks vacation to employees with more than six months continuous service and three weeks for employees with more than ten years. In 1993, the policy changed to provide three weeks vacation to employees with more than seven years continuous employment. Gardner Asphalt's vacation policy specified that vacation time is to be calculated based on the number of years employed, but that the days did not accrue until the start of the new calendar year.[11] Prior to Mr. Barone's termination in December 1994, he had been employed by Gardner Asphalt for seven years, nine months. Based on a computation of vacation accrued under the terms of the new and old plans, Mr. Barone was entitled to thirteen vacation days during 1994. Mr. Barone admitted at his deposition that he took thirteen days vacation during 1994. Mr. Barone's testimony is consistent with Gardner Asphalt's records.

## DISCUSSION

Fed.R.Civ.P. 56(c) provides for summary judgment when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir.1985), *cert. denied*, 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986); *Chaffee v. Kraft General Foods, Inc.*, 886 F.Supp. 1164, 1167 (D.N.J.1995). The party opposing the motion for summary judgment cannot rest on mere allegations or denials but must instead present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243, 106 S.Ct. 2505, 2507, 91 L.Ed.2d 202 (1986); *Sound Ship Bldg. Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

### *Wrongful Discharge Claim*

■ Pursuant to New Jersey state law,[12] an employment of no set duration may be terminated at the will of either the employer or the employee; this long-standing rule allows either party to the employment relationship to terminate that relationship with or without cause or notice, in the absence of an implied or express contract providing otherwise. *Velantzas v. Colgate–Palmolive Co., Inc.*, 109 N.J. 189, 191, 536 A.2d 237 (1988); *English v. College of Medicine and Dentistry*, 73 N.J. 20, 23, 372 A.2d 295 (1977); *see also Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 397, 643 A.2d 546 (1994) ("[i]n New Jersey, an employer may fire an employee for good reason, bad reason, or no reason at all under the employment-at-will doctrine.")

■ Absent a written contract of employment, there are only two exceptions to the at-will doctrine: (1) where the employee is terminated in violation of a clear expression of public policy, *see Velantzas*, 109 N.J. at 191–92, 536 A.2d 237 (citing *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980)); or (2) where the employee handbook creates an implied contract of employment. *Woolley v. Hoffmann–LaRoche, Inc.*, 99 N.J. 284, 285–86, 491 A.2d 1257, *modified*, 101 N.J. 10, 499 A.2d 515 (1985); *Witkowski*, 136 N.J. at 392, 643 A.2d 546; *Nicosia v. Wakefern Food Corp.*, 136 N.J. 401, 407–08, 643 A.2d 554 (1994). The second exception to the at-will employment doctrine

---

11. Gardner Asphalt distributed to all its employees a memorandum, dated September 21, 1994, entitled "Vacation Pay Entitlement Upon Termination of an Employee", to clarify Gardner Asphalt's policy regarding payment of vacation pay upon an employee's termination.

12. Gardner Asphalt's home office is located in Tampa, Florida, but it has regional offices scattered around the country, including Kearney, New Jersey. Mr. Barone is a New Jersey resident who worked out of Gardner Asphalt's Kearney, New Jersey office. Before Gardner Asphalt removed this case to federal court, it was in the Superior Court of New Jersey. Accordingly, it is not disputed by the parties that New Jersey law should apply.

applies to employees whose employment is governed by an employee handbook or manual. "[A]bsent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will be fired only for cause may be enforceable against an employer even when the employment is for an indefinite term and would otherwise be terminable at will." *Id.*

■ Mr. Barone does not allege either a public policy claim or that Gardner Asphalt's Personnel Policy Manual constitutes an implied employment contract. However, even if Mr. Barone had made an implied contract claim, there is express disclaimer language in the Manual which provides otherwise. Under Policy 103:1 of the Manual, entitled "Employment-at-Will", it states that it is "the policy of the company that all employees who do not have a written employment agreement are employed at the will of the company for an indefinite period. Employees may resign from the company after prior notice and may be terminated by the company at any time, for any reason, and with or without notice." Latoff Certif., Ex. M.[13] Mr. Barone admitted signing an "Acknowledgment", stating that he had received this Manual. Latoff Certif., Ex. L. In addition, Mr. Barone's wrongful discharge claim is especially inappropriate given that, during his deposition, he conceded that, at least until December 13, 1994, he had been employed at-will.

■ Mr. Barone's claim for wrongful discharge, based on the writing of December 13, 1994, entitled "Conditions of Employment", (hereinafter, the "Memorandum"), also must fail. Nowhere in this Memorandum does it state (a) that it is an employment contract; (b) that compliance with these requirements will guarantee employment for any specific duration; (c) that Mr. Barone is anything more than an at-will employee; or (d) that there is a promise of employment for a determinate amount of time or that there is any restriction placed on Gardner Asphalt's ability to terminate Mr. Barone. In short, nothing in this Memorandum alters Mr. Barone's status as an at-will employee.

In addition, there is no merit to Mr. Barone's suggestion that his colloquy with Mr. Bell—i.e., Mr. Barone's question to Mr. Bell about whether "Tampa" (the national office) had approved the Memorandum, and Mr. Bell's response that it was approved—is proof that the Gardner Asphalt intended the Memorandum to be some sort of an employment contract. In short, Mr. Barone fails to refute defendant's evidence, demonstrating that there was never an employment contract, express or implied, between Mr. Barone and Gardner Asphalt.

Plaintiff has failed to create a genuine issue as to a material fact; therefore, his wrongful discharge claim against defendant Gardner Asphalt is dismissed.

### *Age Discrimination Claim*

To sustain a claim for age discrimination, a plaintiff must proceed under the shifting burdens analysis first enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).[14] Under the shifting burdens analysis, a plaintiff must first establish a prima facie case of discrimination. *Id.;*

---

**13.** Because Gardner Asphalt provides the text of Policy 103:1 of the Manual as an isolated exhibit, it is unclear whether it constitutes a "clear and prominent disclaimer", *see Witkowski*, 136 N.J. at 392, 643 A.2d 546, thereby precluding a claim that the Manual creates a contract by implication. However, Mr. Barone does not raise the issue of the placement of the disclaimer in the Manual and therefore it is irrelevant for purposes of the wrongful discharge in this case.

**14.** New Jersey courts have interpreted the proofs and burdens of persuasion for discrimination under New Jersey's Law Against Discrimination ("LAD") and the Federal Age Discrimination Employment Act ("ADEA") 29 U.S.C. §§ 621–634, in the same manner as the Supreme Court

did in *McDonnell Douglas*, in deciding a Title VII case. *See Erickson v. Marsh & McLennan Co., Inc.*, 117 N.J. 539, 550, 569 A.2d 793 (1990) (LAD); *Clowes v. Terminix International, Inc.*, 109 N.J. 575, 595, 538 A.2d 794 (1988) (LAD); *see also Maxfield v. Sinclair International, Inc.*, 766 F.2d 788, 791 (3d Cir.1985) (ADEA), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986); *E.E.O.C. v. MCI International, Inc.*, 829 F.Supp. 1438, 1449 (D.N.J.1993) (ADEA). Although plaintiff's Complaint in this case makes no reference to either LAD or ADEA, it is assumed by the Court that the instant age discrimination claim is premised on these laws. Accordingly, the Court will discuss the federal and state claims together.

see also *O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 341 (3d Cir.1990); *Maxfield*, 766 F.2d at 791; *E.E.O.C.*, 829 F.Supp. at 1449; *Goodman v. London Metals Exchange, Inc.*, 86 N.J. 19, 31, 429 A.2d 341 (1981).[15] A prima facie case of age discrimination is demonstrated where the plaintiff demonstrates that he or she (1) is a member of a protected class (i.e., at least 40 years of age); (2) was performing his job in a satisfactory manner; (3) was discharged despite being qualified; and (4) was ultimately replaced by a person sufficiently younger with equal or inferior qualifications.[16] *Turner*, 901 F.2d at 342; *Maxfield*, 766 F.2d at 791–92; *E.E.O.C.*, 829 F.Supp. at 1449. "Establishment of the prima facie case gives rise to a [rebuttable] presumption that the employer unlawfully discriminated against the applicant." *Goodman*, 86 N.J. at 31, 429 A.2d 341 (citing *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)).

If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the employee's termination.[17] *Turner*, 901 F.2d at 342; *E.E.O.C.*, 829 F.Supp. at 1449; *Goodman*, 86 N.J. at 31, 429 A.2d 341. Defendant's burden here is one of production, not persuasion, and therefore the defendant need only introduce evidence of "reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks*, 509 U.S. at 507, 113 S.Ct. at 2747.

If the defendant-employer meets its burden, neither the presumption nor the *McDonnell Douglas* framework are relevant, and "the burden shifts back to plaintiff to prove by a preponderance of the evidence that defendant's stated reasons were a pretext for discrimination, i.e., that the reasons were false *and* that discrimination (here, on the ground of age) was the real reason." *E.E.O.C.*, 829 F.Supp. at 1449; *Goodman*, 86 N.J. at 32, 429 A.2d 341. Thus, in sum, it is important to note that although the *McDonnell Douglas* analysis initially shifts the burden of production to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Hicks*, 509 U.S. at 507, 113 S.Ct. at 2747.

■ In this case, Mr. Barone clearly can establish the first two elements of his prima facie case of age discrimination: that he is a member of a protected class (older than 40) and that Gardner Asphalt discharged him. However, Mr. Barone cannot prove the other two elements of his prima facie case: that he was performing his job at Gardner Asphalt satisfactorily and that he was replaced by someone younger with equal or inferior qualifications. There is substantial evidence in

---

15. If the plaintiff is able to point to direct evidence of discrimination, the *McDonnell Douglas* shifting burdens analysis is inapplicable. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985); *Gavalik v. Continental Can Co.*, 812 F.2d 834, 853 (3d Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987); *Maxfield*, 766 F.2d at 791. The reason for this distinction "is that in most cases direct evidence of discriminatory intent is unavailable or difficult to acquire." *E.E.O.C.*, 829 F.Supp. at 1449 (citing *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3rd Cir.1987)).

16. There is no "greater inference of age discrimination ... when a 40 year-old is replaced by a 39 year-old than when a 56 year-old is replaced by a 40 year-old." *O'Connor*, —— U.S. at ——, 116 S.Ct. at 1310. Rather, the Court views "the fact that a replacement is substantially younger than the plaintiff [as] ... a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *Id.*

17. In addition, it should be noted that it is well-settled pursuant to New Jersey state law that an employer is not required to retain non-performing employees; in short, LAD expressly provides that there is nothing which can "prevent termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment. N.J.S.A. 10:5–2.1. *See also Jansen v. Food Circus Supermarkets, Inc.*, 110 N.J. 363, 374, 541 A.2d 682 (1988).

the record regarding Mr. Barone's substandard performance at Gardner Asphalt. In addition, after Mr. Barone's termination, Mr. Bell, who was already Vice President of National Sales at Gardner Asphalt, assumed responsibility for sales in the northeast, i.e., Mr. Barone's job. Ultimately, the northeast region was merged with portions of the Midwest to form a new region. Eventually, the regional manager, who had been residing in Pittsburgh, took over this redefined area, which required new and different duties. Although Gardner Asphalt admits that this regional manager was 43 years old, and therefore younger than Mr. Barone, Gardner Asphalt believed that the new manager's skills and motivation were superior to those of Mr. Barone.

However, assuming *arguendo* that Mr. Barone established a prima facie case of age discrimination, Gardner Asphalt has still introduced substantial evidence which, if believed by the trier of fact, would support a finding that Mr. Barone lost his job because of his substandard performance, including the decrease in business in the northeast region. Moreover, once Gardner Asphalt articulates a legitimate and nondiscriminatory reason for the termination, the burden shifts back to Mr. Barone not only to rebut Gardner Asphalt's evidence but also to adduce evidence which shows that discrimination was more likely than not to have been a motivating or determinative cause of his termination. *See E.E.O.C.*, 829 F.Supp. at 1449; *Goodman*, 86 N.J. at 32, 429 A.2d 341. Mr. Barone has not met this burden. Indeed, during his deposition Mr. Barone admitted that, subsequent to his termination, he never told anyone that he believed he was discriminated against on account of his age and that no one had made any comments about his age during his employment at Gardner Asphalt.

Mr. Barone's claim of age discrimination against defendant Gardner Asphalt is therefore dismissed.

### Bonus Claim

Mr. Barone alleges that he is due a bonus in the amount of $7,200 based on his performance at Gardner Asphalt during their 1993–94 fiscal year. Gardner Asphalt claims that the reason it did not give Mr. Barone a bonus is that the bonus program was a discretionary program paid to employees who significantly contribute to an increase in the sales of Gardner Asphalt. However, Mr. Barone's evidence indicates that he may be entitled to a bonus from Gardner Asphalt for his sales efforts in the 1993–94 fiscal year. First, the Gardner Asphalt "Intercompany Memos" from David Robertson, dated January 19, 1994 and February 1, 1994 clearly indicate that the bonus program at Gardner Asphalt was not discretionary and indeed was nothing more than a straight mathematical calculation based on an individual's quota sales. *See* Barone Certif., Ex. 3 and Latoff Certif., Ex. P. In addition, the Certification from Richard Thurston, who was Mr. Barone's contact at Channel, provides evidence that Mr. Barone contributed to increased sales at Gardner Asphalt during their 1993–94 fiscal year. Specifically, Mr. Thurston states that "[b]ecause of Mr. Barone's efforts for Gardner Asphalt, which resulted in a annual sales increase of approximately 35% for 1993, Gardner Asphalt was recognized by Channel Home Centers as 'vendor of the year.'"

In sum, the Court will not dismiss Mr. Barone's bonus claim against Gardner Asphalt because on this issue Mr. Barone has presented evidence that creates a genuine issue as to a material fact.

### Vacation Claim

Mr. Barone also claims that he was entitled to compensation for fifteen days of vacation that he never took in 1994. However, Gardner Asphalt provides evidence which demonstrates that Mr. Barone was entitled to thirteen days of vacation during 1994 and that Mr. Barone took all thirteen days. In addition, Mr. Barone admitted at his deposition that he took thirteen days of vacation in 1994.

In sum, Mr. Barone fails to set forth any facts that create a genuine issue as to a material fact in support of his vacation claim.

### CONCLUSION

Accordingly, for the reasons stated above, defendant Gardner Asphalt's motion for sum-

mary judgment is hereby granted as to Counts One, Two and Four of the Complaint and denied as to Count Three of the Complaint.

## ORDER

This matter having been opened to the Court by Hannoch Weisman, attorneys for Gardner Asphalt Corporation ("Gardner Asphalt"), and the Court having considered the submissions of the parties, and good cause appearing,

IT IS on this 20th day of February, 1997,

ORDERED that defendant Gardner Asphalt's motion for summary judgment, pursuant to Fed.R.Civ.P. 56(c), for an Order of dismissal of the Complaint is hereby granted as to Counts One, Two and Four of the Complaint and denied as to Count Three of the Complaint;

IT IS FURTHER ORDERED that all parties shall appear before this Court for a pre-trial conference on March 4, 1997, at 10:30 a.m., in Courtroom 4C, United States District Court, Martin Luther King, Jr., Courthouse, Newark, New Jersey.