**Susan FARRELL, Plaintiff,**

v.

**PLANTERS LIFESAVERS COMPANY and Nabisco, Inc., Defendants.**

**No. CIV. 97–1059 JAG.**

United States District Court, D. New Jersey.

Oct. 5, 1998.

Henry L. Saurborn, Jr., Kaiser Saurborn & Mair, P.C., Jersey City, NJ, David N. Mair, Kaiser Saurborn & Mair, P.C., New York, NY, for Plaintiff.

Joel L. Finger, Robert A. Bell, Michael P. Pappas, Roberts & Finger, LLP, Parsippany, NJ, for Defendants.

## OPINION

GREENAWAY, District Judge.

This matter comes before the Court on four motions: (1) the motion for summary judgment of Roberts & Finger, LLP, counsel for defendants Planters LifeSavers Company ("PLC") and Nabisco, Inc. ("Nabisco") (collectively "Defendants"); (2) the cross-motion of Kaiser, Saurborn & Mair, P.C., counsel for plaintiff Susan Farrell ("Farrell"), to compel discovery and preclude evidence withheld by Defendants; (3) Defendants' motion appealing Magistrate Judge Haneke's February 19, 1998 order denying their motion to compel discovery; and (4) Defendants' motion appealing Magistrate Judge Haneke's May 27, 1998 rulings with respect to the pretrial order.

This is an employment discrimination and breach of contract action. Farrell alleges sex discrimination in her title, grade and pay. She also alleges that Defendants terminated her employment in retaliation for her allegations of sex discrimination and because she rebuffed her supervisor's sexual advances. Farrell also claims that Defendants fired her without cause in breach of an implied employment agreement. For the reasons set forth below, the Court shall grant Defendants' motion for summary judgment but deny as moot (1) Farrell's cross-motion to compel discovery and to preclude evidence withheld by Defendants; (2) Defendants' motion appealing Magistrate Judge Haneke's February 19, 1998 decision denying Defendants' motion to compel discovery; and (3) Defendants' motion appealing Magistrate Judge Haneke's May 27, 1998 rulings with respect to the pretrial order.

## FACTS

In 1994, PLC was an operating company of Nabisco.[1] At that time, PLC's facility was located in Winston–Salem, North Carolina.[2] Beginning in the early 1990s and continuing until 1997, PLC undertook a series of cost-cutting measures. These measures included the elimination of middle-management positions and the overall reduction of its work force. As part of this cost cutting process, in 1992, PLC hired Douglas DeLong ("DeLong") as Director of Materials Management. DeLong's responsibilities included, *inter alia*, formulating new approaches for reducing operating costs in the Materials Management department. DeLong reorganized the Materials Management department and brought the Packaging Services, Purchasing, Graphic Design and Production Planning departments under his supervision in Materials Management. The heads of these four above-mentioned departments reported to DeLong, who in turn reported to a Vice–President.

---

**1.** Planters LifeSavers Company has since become the Planters Company and the LifeSavers Company. They are both operating companies of Nabisco

**2.** PLC has since relocated to New Jersey.

**376**

In or about August 1993, DeLong's supervisor, Norm Jungmann, PLC's Vice–President of Operations, instructed DeLong to prepare a proposal setting forth those measures that he (DeLong) believed would result in cost savings for the Materials Management department. In his proposal,[3] DeLong recommended, *inter alia,* consolidating the Packaging Services and the Graphic Design departments and restructuring the Purchasing department. *See* DeLong Aff., Ex. A. However, due to various business factors including the implementation of certain cost saving initiatives such as a new Supply Chain System,[4] DeLong recommended that this particular suggestion in his proposal not be implemented until late 1994 or early 1995.

In November or December 1993, Gary Eckenroth, Vice–President of Human Resources and Administration for PLC, and Bruce Wood, President of PLC, decided to discharge the Director of Packaging Services, Ronald Yonker, for unsatisfactory performance. Yonker had reported directly to DeLong.

At some point before Yonker's termination became effective, the Human Resources department at PLC decided to eliminate Yonker's title of "Director, Packaging Services" and retitle the position "Senior Manager, Packaging Services".[5] PLC made this decision, in part, because after DeLong reorganized the Materials Management department, Yonker's peers in that department were titled "Senior Manager"[6] or below and reported to a Director, DeLong. PLC preferred that a director not report to another director.[7] However, PLC did not downgrade Yonker's title when DeLong reorganized the Materials Management department because it was Nabisco's policy to avoid downgrading an incumbent's title or grade[8] after restructuring a department where a substantial part of the responsibilities remain with the position.[9] Further, Yonker had held the title of "Director" since the beginning of his employment with PLC in 1974. Thus, Yonker's title was "grandfathered" as a "Director" title despite the fact that his position ranked lower in the Materials Management department after the reorganization.[10]

### PLC's Hiring of Farrell

In late 1993 or early 1994, PLC began recruiting for both a packaging engineer and another person to replace Yonker as the head of the Packaging Services department. Acting through a recruitment agency, PLC approached Farrell about the packaging engineer position. At the time, Farrell was working as a packaging engineer for McCormick and Company in Hunt Valley, Maryland. Farrell agreed to go to Winston–Salem on January 25, 1994, to interview for the packaging engineer position at PLC.

Either shortly before or during Farrell's interview, PLC decided that based on her

3. The parties refer to this document as a "white paper".

4. The new Supply Chain System initiative was a plan to re-engineer PLC's supply chain with the help of Anderson Consulting. DeLong Dep. at 495:18–497:4. PLC also had to comply with the Nutritional Labeling Education Act by January 1, 1994. Therefore, all the packaging for PLC's products had to list vitamins, carbohydrates, fats, etc. *Id.* at 493:24–494:11. PLC could not eliminate any positions until it had completed some of this work. *Id.* at 498:1–6.

5. The parties dispute when PLC decided to retitle the position, before or after Farrell interviewed at PLC.

6. Yonker's peers in the Materials Management department were the heads of other departments within the Materials Management department: Peggy Bryan, Senior Manager of Graphic De-

sign; Phil Bunch, Senior Manager of Purchasing; Mike Kopetski, Manager of Production Planning (LifeSavers); and Robert Wodarczyk, Manager of Production Planning (Planters).

7. PLC's management hierarchy included managers, directors, vice-presidents and the president.

8. PLC's and Nabisco's employee salaries are determined by grade.

9. This policy is set forth in writing in Nabisco's "1993–94 Salaried Employees Compensation Guidelines." *See* Felix–McAllister Aff., Ex. A.

10. PLC decided to pay Yonker's successor $90,000 per year as opposed to Yonker's salary of $90,700 even though Yonker had worked at PLC since 1974. Also, PLC decided to retitle Yonker's position to "Senior Manager", but it did not alter the salary grade (grade 14).

qualifications,[11] she should interview for the newly created Senior Manager, Packaging Services, position rather than the packaging engineer position for which PLC had recruited her. Farrell agreed to interview for the Senior Manager, Packaging Services, position.

Due to an error on PLC's part, one of Farrell's interviews was with Yonker, the person she would be replacing. PLC had not yet notified Yonker of his termination so Yonker believed that Farrell was interviewing for another position other than his own. As a result of seeing how PLC treated Yonker, Farrell sought assurances regarding the job security she would have if she accepted the position. DeLong assured her that PLC had repeatedly warned Yonker about his performance. DeLong added that she would only be fired for poor performance.

By letter dated February 4, 1994, Larry Norvell, Manager of Human Resources at PLC, formally extended an offer of employment to Farrell for the position of Senior Manager, Packaging Services. The yearly salary for the position was $90,000 and a signing bonus of $7,500. As part of its hiring relocation package, PLC agreed to purchase Farrell's home in Maryland for $240,000. Norvell's letter also added that PLC would pay for relocation back to Farrell's place of origin or closer, if her employment with PLC ended within the first 24 months of employment "due to performance concerns or position elimination". Farrell Cert., Ex. B. Farrell accepted the offer of employment by letter dated February 11, 1994.

Farrell commenced her employment at PLC on March 28, 1994. PLC gave her a copy of its employee handbook. Farrell assumed most of the responsibilities that Yonker had previously performed and she reported directly to DeLong. Seven employees reported directly to Farrell, including five packaging engineers. Farrell's department serviced all of the packaging design and implementation requirements for the Planters and LifeSavers product lines.

### Farrell's Proposal to Reevaluate her Title and Grade

During the hiring process, Farrell had requested the title of "Associate Director" instead of "Senior Manager". PLC told her that the title of the position was "Senior Manager" but she could seek a reevaluation of the title after she was hired if she felt it was appropriate. In April or May 1994, Farrell asked DeLong and Eckenroth how she should go about requesting a reevaluation of her job title and salary grade, as well as the salary grades of her direct reports. Eckenroth told her to contact Tony Brown, Manager of Employee Relations, who would assist her with the process of making a review request to Nabisco's Compensation Group.[12]

Eckenroth, DeLong and Brown assisted and supported Farrell in her efforts in requesting a reevaluation of her position, as well as the salary grades of her direct reports. Karen Felix–McAllister, a Compensation Analyst in Nabisco's Compensation Group, told Farrell what information she needed to submit to Nabisco in order to have her request evaluated. From June through August 1994, Farrell gathered information including job descriptions relating to those individuals at PLC and Nabisco whom she believed performed functions comparable to her and her direct reports. Farrell concluded that her position and the positions of her direct reports were not titled and/or graded properly as compared to other employees within Nabisco.

In or about September 1994, PLC's Human Resources department submitted Farrell's formal reevaluation proposal to Nabisco's Compensation Group. Farrell proposed that the managers who reported to her be upgraded from a grade 10 to a grade 12. In addition, she requested that her own title, "Senior Manager, Packaging Services", be upgraded to the title of "Director, Packaging Services", and that her grade level of 14 be

---

**11.** Farrell has a Bachelor of Science in Package Engineering from Rochester Institute of Technology and a Masters of Administrative Sciences (similar to a Masters in Business Administration) from John Hopkins University.

**12.** Nabisco's Compensation Group was responsible for handling requests for job reevaluations.

upgraded commensurate with the change in title. DeLong and Eckenroth reviewed and approved Farrell's proposal before its submission.

Felix–McAllister reviewed Farrell's proposal. Felix–McAllister was responsible for position evaluations and reevaluations in several areas (including materials management) within Nabisco and its operating companies, including PLC.

Nabisco's process for re-evaluating job positions in 1994 is set forth in Nabisco's 1993–1994 Salaried Employees Compensation Guidelines. Felix–McAllister Aff., . Ex. A. The guidelines require that a Compensation Analyst develop a scope and impact of the position that she is evaluating so that she can make internal and external comparisons to other positions. Some of the factors that may be used to determine the scope and impact of a position include: (1) sales dollars; (2) profits; (3) number of people in the department that the position is responsible for; (4) the budget for the department; (5) the function that the individual is performing; (6) the responsibilities of the position; and (7) the number of levels down from the President of the business.

After determining the position's scope, the Compensation Analyst looks at the internal equity of the position. She determines whether the position is correctly aligned within the organizational structure of the position's department in relation to the entire company. In order of importance, the Compensation Analyst looks at the internal equity within the position's (1) business unit (such as the Materials Management department at PLC); (2) similar business units; and (3) all across Nabisco.

In addition, the Compensation Analyst also conducts an external analysis of the position. Nabisco participates in several external surveys that compile data from other companies and provide comparison information relating to positions in a particular industry. Nabisco used the William M. Mercer Food Industry Group Survey for PLC.

Once she completes the analysis of internal and external factors, the Compensation Analyst determines whether there should be a change in the title or grade of the position.

Felix–McAllister reviewed Farrell's proposal in accordance with Nabisco's 1993–1994 Salaried Employees Compensation Guidelines. In determining the scope and impact of Farrell's position, Felix–McAllister considered several factors: the number of employees that reported directly to Farrell; the level of Farrell's supervisor, DeLong; the number of levels that Farrell was below the President of PLC; PLC's sales revenue; and Farrell's job responsibilities.

Based on the scope of Farrell's position, Felix–McAllister determined that Farrell's position was comparable to the positions within Farrell's business unit (the Materials Management department) held by Phil Bunch and Peggy Bryan, both Senior Managers. Felix–McAllister opined that both Bunch and Bryan had similar areas of responsibility and had comparable reporting obligations compared to Farrell.

Bunch was the Senior Manager of Purchasing at PLC. His position was graded at a level 14 and he reported to DeLong (Farrell's supervisor). Like Farrell, there were three levels between Bunch and the President of PLC. Fourteen employees reported directly to Bunch whereas only seven employees reported directly to Farrell. Bunch was responsible for purchasing materials (including packaging materials) for PLC.

Bryan was the Senior Manager of Graphic Design at PLC at a grade level 14. She also reported to DeLong and had three levels between her and the President of PLC. Bryan had five employees reporting directly to her. She was responsible for the graphic design of packaging for PLC.

Felix–McAllister concluded that Bunch and Bryan were Farrell's peers in her business unit (the Materials Management department) and at PLC. Bunch and Bryan, both Senior Managers like Farrell, reported to the same supervisor as Farrell, had a similar number of persons reporting to them and were the same number of levels (three) below the President of PLC as Farrell. Based on her internal analysis of PLC, Felix–McAllister determined that Farrell's grade and title

were appropriate and any change in her title or grade would create inequities within the Materials Management department.

Felix–McAllister then looked at comparable positions within similar business units at Nabisco. The reevaluation request that Farrell had submitted suggested three individuals for comparison purposes: William Haughey, James Scott and Walter Braun.

William Haughey held the position of Director of Packaging Engineering in the Engineering and Operating Planning Division of the Nabisco Biscuit Company ("NBC"), an operating company of Nabisco, from 1992 to June 1994.[13] Haughey was responsible for designing and implementing packaging systems machinery and special equipment for the manufacturing process. His salary grade level was 16 and he earned $119,500 yearly. He reported to Donald Boyle, Senior Director of Package Engineering and Product Control for NBC. Twelve employees reported directly to Haughey. In June 1994, NBC promoted Haughey to Senior Director of Package Engineering and Product Control. NBC increased his salary grade to a level 17 and increased his salary to $132,700 per year.

Felix–McAllister concluded that Haughey's position was not similar to Farrell's position. Farrell's position primarily involved designing and developing appropriate packaging for products. On the other hand, Haughey's position involved designing and implementing package systems machinery and special equipment for the manufacturing process.

In 1994, James Scott held the position of Director of Package Development at NBC.[14] Scott's salary grade was 16 and his salary was $118,100 per year. Scott reported directly to W.R. DeLauder, the Vice–President of Product Development for NBC, who in turn reported directly to the President of NBC. Seventeen employees reported directly to Scott.

In 1994, Walter Braun held the position of Director of Packaging Systems (Specialty Products) in the Operations Support division of the Specialty Products and Fleischmann's business units of Nabisco. Braun's salary grade was 16 and his salary was $91,000 per year.[15] Braun reported directly to James Windland, the Senior Director of Operations Support, who in turn reported to the President of Specialty Products. Seven people reported directly to Braun. According to Nabisco's organizational charts, Braun's position was at the same level as the position of Director of Materials Management for PLC; the position Farrell's supervisor, DeLong, held.

In comparing Scott's and Braun's positions to Farrell's, Felix–McAllister looked at several factors set forth in the compensation guidelines, including: sales revenue of the business units, the level of their supervisor, number of reports, levels down from the President of the business unit and the budget allocated for packaging materials in each unit. *See supra* p. 8.

In 1994, the combined planned sales revenues for Nabisco's Specialty Products and Fleischmann's divisions were $973.5 million. The planned sales revenues for NBC was $3.247 billion and for PLC, $1.174 billion. The combined packaging materials budget for Nabisco's Specialty Products and Fleischmann's divisions was $79.9 million. The packaging materials budget for NBC was $217.1 million and for PLC, $91.3 million.

Felix–McAllister concluded that, in comparison with Scott, Farrell's position had less scope and impact. Specifically, Scott's business unit (NBC) had more than double the sales revenues and packaging materials budget that PLC had. Moreover, Scott reported directly to a Vice–President, worked only two levels down from the President of NBC and supervised ten more employees than Farrell.

**13.** Haughey began working for NBC in 1987. The record, however, does not reflect the positions he held prior to 1992.

**14.** Like Haughey, Scott began employment at NBC in 1987, but the record does not reflect the positions he held before 1994.

**15.** As stated above, Farrell's salary was $90,000 per year.

Felix–McAllister concluded that, in comparison with Braun, Farrell's position also had less scope and impact. Although PLC had a larger packaging materials budget and planned sales revenue than the combined Nabisco Specialty Products and Fleischmann divisions, Braun reported to a higher level supervisor (Senior Director) than Farrell. In addition, Braun was only two levels below the President of Specialty Products and Braun was a peer of DeLong, Farrell's supervisor.[16]

Felix–McAllister also evaluated Farrell's position using the William M. Mercer Food Industry Group Survey, which consisted of data provided by an outside independent consultant. Utilizing this survey data, Felix–McAllister compared Farrell's position to similar positions in the food industry. Incorporating this data into her decision-making process, Felix–McAllister concluded that Farrell's position was properly graded and titled.[17]

On or about October 14, 1994, Felix–McAllister submitted her determination to Joel Goldberg, Nabisco's Director of Compensation. Goldberg approved Felix–McAllister's decision. Felix–McAllister then communicated her decision to PLC's Human Resources department, who in turn notified Farrell.

After learning that Nabisco's Compensation Group had denied Farrell's request for an increase in job grade and title, DeLong asked Tony Brown in PLC's Human Resources department whether Farrell could appeal the determination. DeLong Dep. at 230:3–10. Brown told him the decision was final. *Id.*

### Farrell's Allegations of Sex Discrimination

In November 1994, Farrell attended an annual packaging exposition in Chicago called Pack Expo. While in Chicago, James Scott, Director of Package Development at NBC, invited her to a dinner at which Nabisco would be receiving a packaging award. At the dinner, Scott mistakenly introduced Farrell as "director" to various male employees in the Nabisco organization.

Shortly thereafter, in late November 1994, Farrell approached Tony Brown and asked him to review her request for an increase in grade and title. Farrell told Brown that at the dinner in Chicago she met various white males whom she considered to be her peers and they all held the title of "director" or above. Farrell told Brown that she "was wondering if there was an attempt at discrimination" based on sex with respect to her title and grade. Farrell Dep. 528:6–22. Brown told her he would look into it. However, he never spoke to DeLong or Eckenroth about Farrell's allegations. Farrell never raised the subject of discrimination with anyone other than Brown. *See id.* at 531:6–10.

### Farrell's Performance

Beginning in late summer or early fall of 1994, Eckenroth and DeLong began receiving negative feedback about Farrell from some members of PLC's management concerning her availability, attitude and job performance. Don Valenzano, Director of Financial Planning & Analysis for LifeSavers, testified that Trish McHale, Director of Hard Candy; Candy Borreson, Director of Chewy Candy/New Products; and Marcia Moll[18] expressed to him their dissatisfaction with Farrell. McHale, Borreson and Moll, individually complained to Valenzano that Farrell was rarely around to provide guidance and leadership. McHale also told Valenzano that Farrell and her staff (McHale's) were not getting along. In addition, in the summer or fall of 1994, Bryan complained to Suzanne Jabbour, Vice–President/General Counsel, about Farrell. Jabbour Dep. at 22:16–23:5.

---

**16.** Farrell asserts that Felix–McAllister should have compared Farrell's position to the positions held by Rusty Moore, Richard Fazzolare, William Cave, Michael Gentile and Wayne Parrish. However, in her proposal Farrell failed to identify these persons as employees whom she believed held positions comparable to hers. Thus, Felix–McAllister did not compare their positions to Farrell's.

**17.** With respect to the managers who reported directly to Farrell, however, Felix–McAllister determined that their positions should be adjusted from a grade 10 to a grade 11.

**18.** The record does not reflect Moll's title.

Valenzano relayed these complaints regarding Farrell's lack of availability to DeLong. In addition, Borreson herself asked DeLong to intervene when Farrell did not respond to a project that required immediate attention.

In addition, Norvell told DeLong that he had received complaints about Farrell specifically "that she didn't know what she was doing." DeLong Dep. at 308:11–14. Kopetski and Bunch also complained to DeLong directly about Farrell's lack of availability— "she's never around." DeLong Dep. at 313:13–24. Further, in the summer of 1994, the continuous improvement team [19] gave Farrell the award of phantom leader because she was never available. DeLong Dep. at 324:12–22.

After receiving complaints about Farrell, DeLong spoke to Farrell about her lack of visibility and told her that she needed to let people at PLC know what she was working on and what she was accomplishing. DeLong Dep. at 346:2–16.

In support of Farrell, on November 1, 1994, Joel Hollander, Category Director of Gum & Breath Fresheners, sent a message via electronic mail to his group and to DeLong indicating that under Farrell's leadership, the performance of her group had "improved dramatically." Farrell Cert., Ex. C.

### DeLong's Offer of a Promotion

In November 1994, at the Pack Expo in Chicago, DeLong told Farrell that his supervisor, Jungmann, was about to be fired and that he (DeLong) would be taking over Jungmann's position in a few weeks. DeLong then praised Farrell's work performance and offered her a promotion to head the Industrial Engineering department in addition to the Packaging Services department.

Later that day, DeLong requested that Farrell accompany him on a business trip to Puerto Rico to tour a PLC facility. He instructed her to book tickets on the same flight with seats together.[20]

### DeLong's Sexual Advance

While on the airplane en route to Puerto Rico, DeLong placed his hand one inch above Farrell's knee [21] and told her that his wife became jealous when he traveled with her (Farrell). He then asked her whether her husband became jealous when she traveled on business trips with him. Farrell responded by firmly stating "no, I don't give him a reason to and I suggest you do the same" and simultaneously removed his hand from her leg. Farrell Cert. ¶ 14.

After this incident, Farrell and DeLong discussed other matters.[22] They talked about Farrell's move to North Carolina. DeLong asked her if she was still paying the mortgage on her house in Maryland. They then discussed the dates Farrell would be taking off from work. There was no further discussion about jealous partners and DeLong never touched Farrell again.

19. The continuous improvement team was made up of people from each of the departments within Materials Management. In order to build morale within the Materials Management department, the team gave awards to employees who had performed particularly well or who did something positive for the department. However, the team also picked out a person at random and jokingly pointed out something that the individual is known for throughout PLC. This was similar to a "roast". It was at one such "roast", that the team awarded Farrell the phantom leader award. DeLong Dep. at 323:22–324:22. Farrell was present at this roast.

20. DeLong and Farrell had taken overnight business trips together prior to the trip to Puerto Rico. They had gone to Atlanta and to Arkansas and stayed in the same hotel on both occasions.

21. Farrell was wearing pants.

22. Farrell testified that after she rejected DeLong's advance, they continued talking about other matters. See Farrell Dep. 161:20–163:17. She never testified that his demeanor changed or that he treated her differently. However, along with her brief in opposition to Defendants' motion for summary judgment, Farrell submitted a certification stating that when she rejected DeLong's advance, his demeanor changed, he turned away from her and refused to talk to her. Farrell Cert. ¶ 15. Farrell cannot create an issue of material fact by submitting a certification contradicting her prior deposition testimony. See Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 705–06 (3d Cir.1988); Maietta v. United Parcel Serv., 749 F.Supp. 1344, 1359–60 (D.N.J. 1990). Thus, the Court must disregard this portion of Farrell's certification because it contradicts her prior sworn testimony.

The next day at the PLC plant in Puerto Rico, DeLong told Farrell he was heading back to Winston–Salem a day early to find out more about the situation with Jungmann. Farrell Dep. at 184:9–22.

Farrell alleges that throughout her employment at PLC, whenever she wore a skirt to the office—which she did approximately once a month—DeLong always commented to her that it was nice to see her in a skirt. *See* Farrell Cert. ¶ 16. In addition, in October 1994, when Farrell's husband was still living in Maryland and she was working at PLC in North Carolina, DeLong commented that she was pretty calm for someone living apart from her husband for so long and that he would be "bitchier" if he were she. *See* Farrell Dep. at 173:6–10.

Farrell never spoke to anyone at PLC or Nabisco about DeLong's sexual advances or comments, even though PLC's employee handbook mandates that an employee report such behavior.

### Consolidation of the Packaging Services and the Graphic Design Departments

In or about mid–1994, PLC's management began receiving increased pressure from Nabisco to reduce costs. Eckenroth met with the President of PLC, Bruce Wood, several times to discuss potential head count reductions and position eliminations that could be made to reduce costs. They specifically discussed combining the Packaging Services and the Graphic Design departments.

In November 1994, Eckenroth met with Sandy Putnam, Vice–President/General Manager of PLC, and discussed cost containment and reduction measures, including potential job eliminations. Specifically, they discussed combining Farrell's and Bryan's [23] position and eliminating Bunch's position.[24]

By late November or early December 1994, PLC decided to consolidate the Packaging Services and the Graphic Design departments. Consequently, PLC had to eliminate the Senior Manager position of one of these departments, either Farrell or Bryan.

### The Decision to Terminate Farrell's Employment

In early December 1994, Eckenroth instructed DeLong to determine who, Farrell or Bryan, should be retained to head the combined Packaging Services/Graphic Design department.

Shortly thereafter, DeLong met with the following heads of departments individually to solicit feedback regarding Farrell and Bryan. DeLong met with Trish McHale, Director of Hard Candy; Candy Borreson, Director of Chewy Candy/ New Products; Phil Bunch, Senior Manager of Purchasing; Ed Lyons, Director of Financial Planning & Analysis for Planters; Don Valenzano, Director of Financial Planning & Analysis for LifeSavers; Dave Van Vliet, Category Director [25]; Sandy Putnam, Vice–President/General Manager of PLC; Suzanne Jabbour, Vice–President/General Counsel; and Larry Norvell, Manager, Human Resources.

DeLong received positive feedback regarding Farrell from Lyons and Jabbour. Jabbour stated, however, that since she did not work with Farrell directly she was not really in a position to evaluate her. Jabbour specifically stated "I have no issues with Susan." Jabbour Dep. at 31:3–4.[26] The other persons DeLong questioned, however, responded that they did not believe that Farrell had contributed much to PLC. Some were particularly negative about Farrell. Valenzano testified that he told DeLong that Farrell's unavailability and her problems with some of the marketing individuals were a cause for concern. Valenzano Dep. at 61:6–12.

---

**23.** As stated before, Peggy Bryan was the Senior Manager of the Graphic Design department.

**24.** PLC eliminated Bunch's position (Senior Manager of Purchasing) shortly after discharging Farrell.

**25.** It is unclear from the record if this is Van Vliet's full title.

**26.** Jabbour personally had no problems with Farrell but she testified that Eckenroth told her that people had complained about Farrell's technical expertise and her interaction with other employees. Jabbour Dep. 51:12–16.

All of the individuals that DeLong questioned praised Bryan's performance highly.[27] They stated that Bryan had met or exceeded their expectations, had responded promptly to their projects, had interacted well with other departments and had conducted herself in a very professional and reliable manner.

DeLong documented his conversations with the above individuals and other information he received about Farrell in a memorandum to file dated December 8, 1994. *See* DeLong Aff., Ex. B. For example, McHale complained that in a meeting concerning a problem with certain General Mills samples, Farrell pointed the blame at someone else. McHale told DeLong that Farrell always blamed others. In addition, Bunch was upset that Farrell had publicly blamed another employee, Julie Fisher, for the General Mills problem.

During the second week of December 1994, DeLong recommended to Eckenroth that Bryan be retained as the Senior Manager of the combined department. Eckenroth approved DeLong's recommendation.

### Farrell's Termination

On December 2, 1994, as the final step of Farrell's relocation to North Carolina, PLC paid movers to transport Farrell's possessions from Maryland to North Carolina. A few days later, PLC's relocation department paid Farrell for her house in Maryland.

On December 13, 1994, Eckenroth approached Farrell and asked her to come to his office. On the way to Eckenroth's office, Farrell asked him what was going on. He replied that there would be a position elimination. Farrell asked whose position was going to be eliminated and he replied "yours". Farrell Dep. at 298:12–20.

DeLong was waiting in Eckenroth's office when Eckenroth and Farrell arrived. According to Farrell, Eckenroth told her that PLC was terminating her employment due to interpersonal issues between her and senior management but would label her discharge a position elimination so that she could remain vested in certain benefits. Farrell Cert. ¶ 19.

After Farrell left PLC on December 28, 1994, Bryan assumed responsibility for the combined Packaging Services and Graphic Design departments until PLC relocated to New Jersey in 1996.

In early 1995, LifeSavers reorganized its Marketing Department and eliminated the positions of Category Director Gum and Breath Fresheners, held by Joel Hollander. Shortly thereafter, PLC eliminated the position of Senior Manager, Purchasing, held by Phil Bunch. In October, 1996, PLC eliminated DeLong's position. DeLong Dep. at 116:17–25.

### The Instant Action

Farrell obtained a right to sue letter from the Equal Employment Opportunity Commission ("EEOC"). On February 27, 1997, Farrell commenced the instant action alleging sex discrimination in her title, pay and grade, *quid pro quo* sexual harassment, retaliation and breach of contract. Defendants now move for summary judgment.

### *DISCUSSION*

### Summary Judgment

Fed.R.Civ.P. 56(c) provides for summary judgment when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996). Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township,* 772 F.2d 1103, 1109 (3d Cir.1985). The party opposing the motion for summary judgment cannot rest on mere allegations and must instead present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 243, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995); *Sound Ship Bldg. Corp. v.*

---

27. Bryan had worked at PLC since 1980.

*Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir.1976).

A genuine issue of material fact exists when a reasonable trier of fact could render a verdict for the non-moving party. *See Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988). In reviewing a motion for summary judgment, it is not the court's function to weigh the evidence, but rather to determine whether there is a genuine issue for trial. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. In determining whether there are any issues of material fact, the court must resolve all reasonable doubts as to the existence of a material fact against the moving party. *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972). Thus, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Carnegie Mellon Univ. v. Schwartz,* 105 F.3d 863, 865 (3d Cir.1997).

### Shifting Burdens

"[I]nost cases direct evidence of discriminatory intent is unavailable or difficult to acquire." *Barone v. Gardner Asphalt Corp.,* 955 F.Supp. 337, 344 n. 15 (D.N.J.1997) (citing *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897 (3d Cir.1987)). As the Supreme Court has aptly stated, "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). "For this reason, our legal system permits discrimination plaintiffs to prove their cases with circumstantial evidence." *Weldon v. Kraft,* 896 F.2d 793, 800 (3d Cir. 1990) (citing *Jackson v. University of Pittsburgh,* 826 F.2d 230, 236 (3d Cir.1987)).

In cases where the plaintiff relies on circumstantial evidence to assert a claim under Title VII, the plaintiff must proceed under the shifting burdens analysis first enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the shifting burdens analysis, a plaintiff must first establish a prima facie case of unlawful discrimination or retaliation. *Id.; see also Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir.1997); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994).[28] A prima facie cases raises an inference of unlawful discrimination or retaliation. *McDonnell Douglas,* 411 U.S. at 803, 93 S.Ct. 1817; *see also Weldon,* 896 F.2d at 797.

If the plaintiff succeeds in establishing the prima facie case, the burden shifts to the defendant-employer to articulate a legitimate, non-discriminatory or non-retaliatory reason for the employee's termination. *Fuentes,* 32 F.3d at 763; *see also Woodson,* 109 F.3d at 920; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Defendant's burden here is one of production, not persuasion, and therefore the defendant need only introduce evidence of "reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742. "The employer need not prove that the tendered reason actually motivated its behavior, as ... the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes,* 32 F.3d at 763; *see also Woodson,* 109 F.3d at 920. If the defendant-employer carries this burden of production, the presumption of unlawful discrimination or retaliation raised by the prima facie case is rebutted. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

If the defendant-employer meets its "relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, ... [to] show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." *Fuentes,* 32 F.3d at 763; *see also Woodson,* 109 F.3d at 920. Thus, at trial, the plaintiff must

---

28. If the plaintiff is able to point to direct evidence of discrimination, the *McDonnell Douglas* shifting burdens analysis is inapplicable. *See Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *Gavalik v. Continental Can Co.,* 812 F.2d 834, 853 (3d Cir.1987).

prove that the employer's stated reasons were a pretext for discrimination or retaliation by convincing the factfinder that (1) the employer's reasons were false; and (2) that discrimination or retaliation was the real reason for the adverse employment action. *Fuentes*, 32 F.3d at 763 (citing *Hicks*, 509 U.S. at 507, 113 S.Ct. 2742); *see also Woodson*, 109 F.3d at 920. "It is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination" *Hicks*, 509 U.S. at 519, 113 S.Ct. 2742. Similarly, in a retaliation case, the plaintiff must prove that retaliatory animus had a determinative effect on the employer's decision to terminate plaintiff. *See Woodson*, 109 F.3d at 931–35.

However, plaintiff's burden is not so high on a motion for summary judgment. A plaintiff who has established a prima facie case of discrimination or retaliation may defeat a motion for summary judgment by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory [or retaliatory] reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764 (citations omitted); *see also Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989). Thus, a plaintiff will survive summary judgment if he discredits the employer's proffered reasons, or if he adduces evidence that discrimination or retaliation was more likely than not a determinative factor in the adverse employment decision. *Fuentes*, 32 F.3d at 764. "[T]he plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory [or non-retaliatory] reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action

(that is, the proffered reason is a pretext)." *Id.* (citations omitted).

Plaintiff does not discredit the employer's proffered reason by merely showing that the employer's decision in firing her was wrong, "since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* 32 F.3d at 765 (citing *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531, 533 (3d Cir.1992)). Rather, the plaintiff discredits the employer's articulated reason by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.*[29]

### Sexual Harassment

■ Title VII prohibits discrimination on the basis of sex with respect to the "compensation, terms, conditions, or privileges" of employment. 42 U.S.C. § 2000e–2(a)(1) (1988). Although neither Title VII nor the legislative history address sexual harassment, "it is now established law that sexual harassment in the workplace violates 'Title VII's broad rule of workplace equality.'" *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir.1994) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). A plaintiff bringing a claim for sexual harassment may proceed under two theories: (1) *quid pro quo;* and (2) hostile work environment. *See Meritor*, 477 U.S. at 64–65, 106 S.Ct. 2399.[30] Farrell has alleged only *quid pro quo* sexual harassment.

---

**29.** A plaintiff may also establish a prima facie case of discrimination under Title VII by demonstrating that a facially neutral employment practice has a disproportionate impact on members of a protected class. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). Proof of discriminatory intent is not required. However, Farrell is not proceeding on a disparate impact theory.

**30.** The terms *"quid pro quo"* and *"hostile environment"* do not appear in the text of Title VII. Those terms first appeared in Catherine MacKinnon's book, *Sexual Harassment of Working Women* (1979), and were then used by various Courts of Appeals. The Supreme Court first used those terms in *Meritor*, 477 U.S. at 64–65, 106 S.Ct. 2399.

In *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1296 (3d Cir.1997), the Third Circuit addressed for the first time the elements of a *quid pro quo* sexual harassment claim. The Court expressly adopted the EEOC's formulation set forth in 29 C.F.R. § 1604.11(a) (1993) which provides two alternative theories for recovery:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual ....

*Robinson,* 120 F.3d at 1296 (quoting 29 C.F.R. § 1604.11(a)). The Court stated that "[s]ubsection (1) addresses cases in which an employee is told beforehand that his or her compensation or some other term, condition, or privilege of employment will be affected by his or her response to the unwelcome sexual advances, ..." *Id.* However, subsection (2) applies to situations "in which the employee's response to sexual advances is thereafter used as a basis for a decision concerning compensation, etc." *Id.*

Farrell alleges subsection (2) *quid pro quo* harassment. Thus, she must demonstrate that "her response to [DeLong's] unwelcome advances was subsequently used as a basis for [the] decision" to terminate her. *Id.* 120 F.3d at 1297. She need not show that submission to the sexual advances was linked to the decision to terminate her employment "at or before the time when the [sexual] advances occurred." *Id.; see also Karibian,* 14 F.3d at 777–78.

### Prima Facie Case

█ To establish a prima facie case of *quid pro quo* sexual harassment, Farrell must establish that: (1) she was a member of a protected class; (2) she was subject to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment complained of was based on sex; (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in tangible job detriment; and (5) respondeat superior liability exists. *Egli v. Stevens,* No. CIV.A.93–157, 1993 WL 153141, at *3 (E.D.Pa. May 11, 1993), *aff'd without opinion,* 17 F.3d 1429 (3d Cir.1994); *see also Bonenberger v. Plymouth Township,* No.CIV.A.96–403, 1996 WL 729034 (E.D.Pa. Dec.18, 1996), *aff'd in part and rev'd in part on other grounds,* 132 F.3d 20 (3d Cir.1997); *Giordano v. William Paterson College of New Jersey,* 804 F.Supp. 637, 642 (D.N.J.1992).

The first and fifth prongs of Farrell's prima facie case are not in dispute. She is a woman, and therefore is a member of a protected class. Moreover, PLC does not dispute that it has respondeat liability for DeLong's actions.[31] In addition, the harassment Farrell complained of was based on sex. DeLong did not make sexual advances towards male employees. But for her sex, DeLong would not have made sexual advances towards Farrell. *See Henson v. City of Dundee,* 682 F.2d 897, 904 (11th

---

**31.** "Because the *quid pro quo* harasser, by definition, wields the employer's authority to alter the terms and conditions of employment—either actually or apparently—the law imposes strict liability on the employer for *quid pro quo* harassment." *Karibian,* 14 F.3d at 777; *see also Robinson,* 120 F.3d at 1296 n. 9; *Meritor,* 477 U.S. at 76, 106 S.Ct. 2399 (Marshall, J., concurring).

Last term the Supreme Court held that "the labels *quid pro quo* and hostile work environment are not controlling for purposes of establishing employer liability." *Burlington Indus., Inc. v. Ellerth,* — U.S. —, —, 118 S.Ct. 2257, 2271, 141 L.Ed.2d 633 (1998). Thus, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages ... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* — U.S. —, 118 S.Ct. at 2270. However, no affirmative defense is available to the employer when the supervisor's harassment culminates in a tangible adverse employment action such as discharge or demotion. *Id.*

Cir.1982) ("In the typical case in which a male supervisor makes sexual overtures to a female worker, it is obvious that the supervisor did not treat male employees in a similar fashion. It will therefore be a simple matter for the plaintiff to prove that but for her sex, she would not have been subjected to sexual harassment."). Therefore, Farrell has established the third element of her prima facie case.

■ Defendants contend that Farrell cannot establish the second element of a prima facie case because DeLong's conduct does not constitute a sexual advance or request for sexual favors as a matter of law. The Court disagrees with Defendants. The EEOC Guidelines provide that "the discriminatory, unwelcome 'verbal conduct' ... must ... be of a sexual nature in order to constitute sexual harassment." EEOC Compliance Manual, Interpretive Bulletin No. 43 (Appendix 9). DeLong asked Farrell whether her husband got jealous when she traveled with him (DeLong) because his wife did. Such a statement alone might not be considered sexual in nature. However, DeLong made this comment as he placed his hand one inch above Farrell's knee. Thus, DeLong's comment in addition to him placing his hand on Farrell's knee can be inferred to be sexual in nature.

In addition, DeLong's placement of his hand above Farrell's knee is also sexual in nature. The EEOC Guidelines provide that physical conduct such as grabbing a person's arm "is sex discrimination if it is based on the sex of the person subjected to it. However, it is not sexual harassment unless the manner or context in which it occurs has sexual implications." *Id.* DeLong's placement of his hand one inch above Farrell's knee in the context of a question about whether her husband becomes jealous when she travels with him "has sexual implications." *See id.* DeLong's conduct on the airplane can reasonably be construed as a sexual advance.

■ Defendants also argue that Farrell has not established the fourth element of her prima facie case because she had failed to point to some evidence from which a factfinder can infer that DeLong intended to condition job benefits or detriments on Farrell's reaction to his sexual conduct. However, as the Third Circuit stated, a plaintiff alleging subsection (2) sexual harassment need only show that "her response to the unwelcome advances was subsequently used as a basis for [the] decision" to terminate her. *Robinson,* 120 F.3d at 1297. Thus, the evidence must be sufficient to entitle a reasonable factfinder to conclude that DeLong used Farrell's response to his advances as a basis for the decision to fire her. *See id.* 120 F.3d at 1298 n. 12 & 1299.

In *Lynch v. New Deal Delivery Serv., Inc.,* 974 F.Supp. 441 (D.N.J.1997), the chief operating officer told plaintiff: "You look really great. I can't help noticing since you have been working out, you must have lost a lot of weight. It's not that I stare at your body all the time, but you can't help noticing." *Id.* 974 F.Supp. at 447. He also asked her "What do you do on week nights? You got something on the side? Are you playing around?" *Id.* He would call her at home at night several times a week and begin the conversations by saying: "Hi, babe, what are you doing?" *Id.* He also asked for the key to the apartment that the company was renting for plaintiff. *Id.* Further, he suggested to plaintiff on various occasions that they work out together at his gym and have dinner afterwards. *Id.* Plaintiff declined his invitations and he did not appear hostile or pressure her to change her mind. *Id.*

In *Lynch,* the Court dismissed plaintiff's claim of *quid pro quo* sexual harassment on summary judgment. *Id.* 974 F.Supp. at 452. The Court found that plaintiff had not presented evidence of sexual demands because when plaintiff declined the alleged harasser's dinner invitations, he did not press the issue nor did he appear hostile towards her as a result of those rejections. *Id.* Ultimately, the Court held that no reasonable factfinder could conclude that the alleged harasser's attentions involved an implicit or explicit threat. *Id.* The Court added that invitations to dinner without more, cannot be reasonably characterized as the type of sexual conduct that would give rise to a *quid pro quo* claim. *Id.*

■ This Court finds the reasoning in *Lynch* persuasive. Like the defendant in *Lynch*, once Farrell rejected DeLong's advance, he did not pressure her nor did he ever again bring up the topic of jealous partners. There is no evidence that DeLong acted hostile toward Farrell after she rejected his advance. Farrell asserts that the fact that DeLong left her in Puerto Rico and returned to Winston–Salem a day early is evidence of DeLong's hostility towards her. However, DeLong testified that he returned to Winston–Salem a day early because he wanted to investigate the situation with Norm Jungmann. Farrell also testified that DeLong told her he was leaving Puerto Rico a day early for those reasons. Farrell Dep. at 184:9–22. Farrell has not provided any evidence that DeLong returned to Winston–Salem a day early because she rejected his sexual advance. In addition, Farrell testified that after she rejected DeLong's advance, they discussed the mortgage on her house, her relocation and the dates that she would be absent from work. Farrell Dep. at 161:20–163:17. Thus, the evidence is insufficient to permit a reasonable factfinder to conclude that DeLong used Farrell's response to his advances as a basis for the decision to fire her. *See Robinson*, 120 F.3d at 1298 n. 12 & 1299.[32]

Farrell has failed to establish a prima facie case of *quid pro quo* sexual harassment. Thus, Defendants' motion for summary judgment on this claim is granted.[33]

### Sex Discrimination

■ Under Title VII, an employer may not "discriminate against any individual with respect to [her] compensation ... because of [her] sex." 42 U.S.C. § 2000e–2(a)(1) (1994). To prevail on a claim of sex-based wage discrimination under Title VII,[34] plaintiff must produce evidence of intentional discrimination in the setting of her title, grade and pay.[35] *See County of Washington v. Gunther*, 452 U.S. 161, 178–81, 204, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981) (Rehnquist, J., dissenting)("absent a showing of equal work, there is a cause of action under Title VII [only] where there is direct evidence that an employer has intentionally depressed a woman's salary because she is a woman."); *International Union v. State of Michigan*, 886

32. *See also Bonenberger*, 132 F.3d at 22, 28 (affirming district court's finding of no *quid pro quo* sexual harassment where plaintiff's shift supervisor made obscene remarks towards her, frequently fondled her breasts and pinched her buttocks, since the "supervisor did not suggest, either by word or action, that sexual favors were the price for keeping her job."); *Kidwell v. Sheetz, Inc.*, 982 F.Supp. 1177, 1179–81 (W.D.Va.1997) (plaintiff did not establish prima facie case of *quid pro quo* sexual harassment where her supervisor regularly touched his genitals in plaintiff's presence, pressed his genitals against plaintiff and made repeated sexual remarks, because there was no evidence that supervisor "ever actually demanded sexual favors or asked [plaintiff] out for dates.").

33. As noted above, *see supra* p. 17, in addition to DeLong's sexual advance on the airplane, Farrell has alleged two other instances of harassment. Farrell alleged that whenever she wore a skirt, DeLong commented that it was nice to see her in a skirt. She also alleged that DeLong stated that she was pretty calm for someone living apart from her husband and that he would be bitchier if he were she. Farrell has only alleged *quid pro quo* sexual harassment. These additional comments may be relevant to a hostile environment sexual harassment claim; however, they do not bolster Farrell's *quid pro quo* claim. To assert a hostile environment sexual harassment claim, a

plaintiff must show "sexual harassment so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Faragher v. City of Boca Raton*, — U.S. —, —, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399) (emphasis in original). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal quotations and citations omitted). Even if Farrell had asserted a hostile environment sexual harassment claim, DeLong's behavior was not so severe or pervasive as to alter the terms and conditions of Farrell's employment.

34. Because Farrell has not made any claim under the Equal Pay Act, 29 U.S.C. § 206(d)(1), this Court will make no comment on its applicability in the case *sub judice*.

35. A plaintiff need not produce evidence of intentional sex-based wage discrimination *if she is* proceeding on a disparate impact theory. In that case, she asserts a prima facie case by demonstrating a disparate impact from the employer's use of a facially neutral employment practice. *See EEOC v. J.C. Penney Co., Inc.*, 843 F.2d 249 (6th Cir.1988). However, Farrell is not proceeding under a disparate impact theory.

F.2d 766, 769 (6th Cir.1989) (in case of mere rough job comparability, intentional discrimination must be shown); *Meeks v. Computer Assocs. Int'l,* 15 F.3d 1013, 1018 (11th Cir. 1994); *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 528 (2d Cir.1992); *EEOC v. Madison Community Unit Sch. Dist.,* 818 F.2d 577 (7th Cir.1987).

■ A plaintiff establishes a prima facie case of sex-based wage discrimination by showing that "she occupies a job similar to that of higher paid males." *Meeks,* 15 F.3d at 1019 (citing *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1529 (11th Cir.1992)); *see also Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 478 (7th Cir.1995); *Grigoletti v. Ortho Pharm. Corp.,* 118 N.J. 89, 101, 570 A.2d 903 (1990); *Manuel v. WSBT, Inc.,* 706 F.Supp. 654, 660 (N.D.Ind.1988); *Crockwell v. Blackmon–Mooring Steamatic, Inc.* 627 F.Supp. 800, 802 (W.D.Tenn.1985); *Cf. Churchill v. International Business Machines, Inc.,* 759 F.Supp. 1089, 1097 (D.N.J.1991).

■ Farrell asserts that she has asserted a prima facie case of sex discrimination because she occupied a position similar to James Scott's position, a higher paid male, and her position was downgraded from "Director" for her male predecessor to "Senior Manager".[36] PLC has provided sworn testimony stating that PLC decided to retitle Yonker's position before it even interviewed Farrell. Eckenroth Dep. at 254:12–25; Eckenroth Aff. ¶ 10. However, Farrell has also provided sworn testimony stating that when she interviewed at PLC, she was told that the position would be titled "Director". Farrell Cert. ¶ 31. Construing the facts in the light most favorable to Farrell, the non-moving party, for purposes of this motion, this Court must believe Farrell's testimony and

find that PLC made the decision to retitle Yonker's position after interviewing Farrell.

Farrell, however, has failed to establish that her position was similar to Scott's position. Farrell asserts that Scott's main responsibilities were packaging development of new products. Farrell Cert. ¶ 35. She contends that once the product was in regular production runs, the responsibility for packaging shifted from Scott's department into the packaging commercialization department. *Id.* Farrell claims that her responsibilities were much broader in scope than Scott's responsibilities because her department, Packaging Services, was responsible for all aspects of packaging over the entire life of a product. *Id.* ¶ 36. She also asserts that she and Scott had similar responsibilities for the creation of finished package and packaging material specifications, initiating new projects to promote quality improvements and costs savings and working with suppliers to develop new packaging materials. Farrell Cert. n. 3.

However, it is undisputed that following Farrell's request for a reevaluation of her title, grade and salary, a professional Compensation Analyst, Felix–McAllister, compared Farrell's position to Scott's and concluded that they were not similar. Felix–McAllister concluded that Farrell's position had less scope and impact. First, Scott's business unit (NBC) had more than double the sales revenues and packaging materials budget of PLC. Second, Scott reported directly to a Vice–President; Farrell reported to a Director. Third, Scott was only two levels down from the President of NBC; Farrell was three levels down from the President of PLC. Fourth, Scott had seventeen managers reporting to him; Farrell had seven. Farrell has not provided any evidence

---

36. In her Complaint and response to Defendants' interrogatories, Farrell points to several other males employed by Nabisco whom she contends performed jobs similar to hers but held higher titles or pay grades than she. They are: William Haughey, Director of Packaging Engineering at NBC; Walt Braun, Director of Packaging Systems (Specialty Products); Rusty Moore, Manager of Packaging Technical Services at NBC; Rich Fazzolare, Director of Manufacturing Commercialization at NBC; Wayne Parrish, Director of Operations at PLC; Michael Gentile, Director of

Engineering at LifeSavers; and William Cave, Director of Business and Marketing Analysis at PLC. However, in her brief in opposition to Defendants' motion for summary judgment, Farrell does not even mention these men, much less compare her position to theirs. It appears that Farrell has abandoned this claim. However, even if Farrell did not intend to abandon this claim, she has failed to present any evidence that would have established that her position was similar to the position of the above-mentioned males.

rebutting Felix–McAllister's conclusion that Scott's and Farrell's positions were not similar.

In addition, PLC hired Farrell at virtually the same salary as her predecessor, Ron Yonker ($90,000 per year as opposed to $90,700) and at the same grade (14). Since Farrell's predecessor was a male earning virtually the same as Farrell in relation to the "similarly-situated" males Farrell identified, Farrell's compensation level could not have been set on account of her sex.

■ Notwithstanding that Farrell has not established that her position was similar to Scott's, or that her sex was a basis in the setting of her salary or grade, this Court finds that an inference of intentional discrimination may be drawn from the downgrading of Farrell's position to Senior Manager, if, as Farrell testified, PLC made the decision to retitle the position after interviewing Farrell. Thus, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for retitling her position.

Defendants have articulated a legitimate reason for retitling the position of Director of Packaging Services held by Farrell's predecessor, to Senior Manager. Defendants have provided evidence that when DeLong reorganized the Materials Management department, he brought several departments that had previously reported to other department heads into the Materials Management department to report to him. After the restructuring, all of DeLong's direct reports, except for Yonker, held the title of "Senior Manager" or below. However, PLC did not downgrade Yonker's title because Yonker had been a director since 1974 and it is Nabisco's policy not to downgrade an incumbent's title after a reorganization where a substantial part of the responsibilities remain with the position. *See* Felix–McAllister Aff., Ex. A. Nabisco's Salaried Employees Compensation Guidelines specifically provide that when an incumbent's "[j]ob duties and responsibilities remain substantially the same, but internal rankings result in the job being assigned a lower job grade[, the] [e]mployee retains current job grade. Successor will be assigned to the new grade." *Id.* Thus, once PLC decided to discharge Yonker, it assigned his successor the appropriate title.

Since Defendants have met their burden of articulating a non-discriminatory reason for retitling the Director position to Senior Manager, Farrell has the burden of pointing to some evidence, from which a factfinder could either disbelieve Defendants' articulated legitimate reason or believe that discrimination was more likely than not a determinative cause of her termination. *See Fuentes,* 32 F.3d at 764. To discredit Defendants, Farrell must point to "such weaknesses, implausibilities, inconsistencies, or contradictions in [Defendants'] proffered legitimate reasons... that a reasonable factfinder could rationally find them unworthy of credence ...." *Fuentes,* 32 F.3d at 765. Farrell has not met this burden.

Farrell asserts that if Nabisco required PLC to submit requests for a higher salary, title and grade (such as her request) to Nabisco's Compensation Group, PLC must submit reductions of job titles to Nabisco for approval. However, Nabisco only required that increases in job title, grade and compensation level be submitted for approval. The decision to downgrade a position could be made unilaterally by PLC's Human Resources department and did not require the approval of Nabisco's Compensation Group. *See* Goldberg Aff. ¶¶ 3–4.

Farrell has failed to rebut Defendants' legitimate, non-discriminatory reason for retitling her position. Thus, Defendants' motion for summary judgment on this claim is granted.

### Retaliation

■ Title VII [37] prohibits an employer from taking retaliatory action against an employee for filing a discrimination claim. To establish a prima facie case of retaliation, Farrell must show that: (1) she was engaged in activity protected by Title VII; (2) PLC

---

37. Section 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a) (1982), provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter .. ."

took adverse action against her either after, or contemporaneous with, the protected activity; and (3) a causal link exists between the protected conduct and the adverse employment action. *See EEOC v. L .B. Foster Co.*, 123 F.3d 746, 754 (3d Cir.1997) (citing *Kachmar v. SunGard Data Sys. Inc.*, 109 F.3d 173, 177 (3d Cir.1997)); *Robinson*, 120 F.3d at 1299; *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir.1994); *Pover-omo–Spring v. Exxon Corp.*, 968 F.Supp. 219, 226 (D.N.J.1997). To establish the requisite causal connection, plaintiff must proffer evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir.1990) (citing *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982)). Plaintiff must also show that the persons who took the adverse employment action against her knew of the protected activity and acted with a retaliatory motive. *Gemmell v. Meese*, 655 F.Supp. 577, 582 (E.D.Pa.1986).

Farrell alleges that PLC terminated her employment in retaliation for (1) her allegations of sex discrimination in her grade, title and pay; and (2) because she refused her supervisor's (DeLong) sexual advances. The Court shall address each retaliation claim separately.

### Retaliation for Complaining About Sex Discrimination

Farrell has established the first two elements of a prima facie case of retaliation. First, she was engaged in an activity protected by Title VII both when she initially submitted her proposal to Nabisco's Compensation Group requesting review of her title, grade and pay and when she asked Tony Brown to take another look at her request because she "was wondering if there was an attempt at discrimination" based on sex with respect to her title and grade. Farrell Dep. 528:6–22. Second, PLC took adverse action against her by subsequently terminating her employment. However, Farrell has failed to satisfy the third prong of her prima facie case. She has not produced any evidence from which a reasonable factfinder could in-

fer a causal link between the protected activity and her termination.

First, there is no evidence that anyone at PLC viewed Farrell's request for a reevaluation of her title, salary and grade negatively. On the contrary, Eckenroth expressly told Farrell that PLC would support her in her efforts. Eckenroth Aff., Ex. D. Further, Farrell sent Tony Brown a message via electronic mail thanking him for assisting her with her proposal to be submitted to Nabisco's Compensation group. *Id.* In addition, Farrell admits that DeLong reviewed the materials she gathered to submit as part of her request to the Nabisco Compensation Group and made suggestions on how to present the information to the Nabisco Compensation Group. Farrell Dep. at 611:4–14, 681:16–17, 683:3–8, 686:5–7. There is no evidence of any action that the alleged decisionmakers (Eckenroth and DeLong) took to affect Farrell's request negatively such as contacting Felix–McAllister. In fact, Felix–McAllister testified that no one from Nabisco or PLC ever expressed to her any negative feelings with regard to Farrell's request for a reevaluation or asked her to reach a particular result. Felix–McAllister Aff. ¶ 39. In addition, after Nabisco's Compensation Group rejected Farrell's proposal, DeLong asked PLC's Human Resources department if Farrell could appeal the decision. DeLong Aff. ¶ 15. Given that the alleged decisionmakers, DeLong and Eckenroth, affirmatively supported Farrell's request for a reevaluation, there is no factual basis from which a reasonable factfinder could infer a causal link between the protected activity and her termination.

Second, there is no evidence that the persons who made the decision to terminate Farrell were aware that she believed she had been discriminated against on the basis of sex or that her gender had anything to do with her job title, grade or compensation. Farrell never told anyone other than Tony Brown that she believed discrimination was occurring with respect to her title, salary and grade. There is no evidence that the individuals who Farrell alleges were involved in the decision to terminate her employment (DeLong and Eckenroth) were aware that she

had expressed a concern about sex discrimination. In fact, DeLong and Eckenroth have both testified, without contradiction, that Brown never informed them that Farrell had alleged sex discrimination. DeLong Aff. ¶ 16; Eckenroth Aff. ¶¶ 21–22.

To establish a prima facie case of retaliation, a plaintiff must have evidence that the relevant decisionmakers were actually aware of her protected activity. *See, e.g., Krouse v. American Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir.1997); *Gemmell,* 655 F.Supp. at 582. Since there is no evidence that the alleged decisionmakers, DeLong and Eckenroth, were even aware that Farrell had raised the issue of sex discrimination, they could not possibly have intended to retaliate against her for doing so.

### Retaliation for Rejecting DeLong's Sexual Advances

Although the Third Circuit has not addressed the issue, several district courts have held that the rejection of sexual advances is a protected activity within the meaning Title VII. *See, e.g., Armbruster v. Epstein,* 1996 WL 289991, 68 Empl. Prac. Dec. P 44093 (E.D.Pa.1996); *Burrell v. City Univ. of New York,* 894 F.Supp. 750, 761 (S.D.N.Y.1995); *Boyd v. James S. Hayes Living Health Care Agency, Inc.,* 671 F.Supp. 1155, 1167 (W.D.Tenn.1987).

▆ Title VII prohibits employers from retaliating against an employee because she has opposed an employment practice which has been made unlawful by Title VII. *See* 42 U.S.C. § 2000e–3(a). Title VII prohibits employment discrimination based on race, color, sex or national origin. 42 U.S.C. § 2000e–2. Sexual harassment is a form of sex discrimination proscribed by Title VII. Therefore, rejecting sexual advances itself must comprise protected activity for which employees should be protected for opposing within the meaning of 42 U.S.C. § 2000e–3(a). Thus, this Court concludes that Farrell was engaged in an activity protected by Title VII when she pushed DeLong's hand off her leg and firmly told him that she did not give her husband any reason to be jealous. Termination of employment constitutes adverse action. Thus, Farrell has satisfied the first two elements of a prima facie case of retaliation.

Defendants contend that Farrell has failed to satisfy the third prong of her prima facie case because she has failed to produce any evidence from which a reasonable factfinder could infer a causal link between her rejection of DeLong's sexual advance and her termination. This Court agrees.

The Third Circuit has acknowledged that their "cases are seemingly split on the question of whether the timing of the allegedly retaliatory action, can, by itself ever support a finding of causation." *Krouse,* 126 F.3d at 503 (citing *Robinson,* 120 F.3d at 1302). In *Jalil,* the Court found that the plaintiff had established a prima facie case of retaliatory discharge where the employer fired him two days after filing an EEOC complaint. 873 F.2d at 708. More recently, in *Woodson,* the Court stated in dicta that "temporal proximity between the protected activity and the termination is sufficient to establish a causal link." 109 F.3d at 920; *see also L.B. Foster,* 123 F.3d at 754 (finding that employee's protected activity and the adverse employment action were "sufficiently close together to allow a reasonable factfinder to infer the required element of causation" for a prima facie case, where the adverse action occurred two months after the employee engaged in protected activity); *Kachmar,* 109 F.3d at 177 (finding that adverse employment action taken four months after employee engaged in protected activity is "circumstantial evidence sufficient to raise the inference that [the employee's] protected activity was the likely cause for the adverse action.").

Conversely, the Third Circuit has often held that "timing alone will not suffice to prove retaliatory motive." *Delli Santi v. CNA Ins. Cos.,* 88 F.3d 192, 199 n. 10 (3d Cir.1996). In *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 501 (3d Cir.1991), the Court required more than temporal proximity alone and characterized its statement in *Jalil* "that the timing of the discharge in relation to Jalil's EEOC complaint may suggest discriminatory motives" as the holding of that case (*Jalil*). However, the *Quiroga* Court further stated that in *Jalil,* it "stopped short of creating an inference based upon timing alone." 934 F.2d at 501. Just last year, in

*Robinson,* the Court stated that, "if *Jalil* is to be interpreted as holding that timing alone can be sufficient, that holding must be confined to the unusually suggestive facts of *Jalil.* Thus, even if timing alone can prove causation where the discharge follows only two days after the complaint, the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Robinson,* 120 F.3d at 1302. Two months later, the Court repeated in *Krouse* that "[e]ven if timing alone could ever be sufficient to establish a causal link, ... the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." 126 F.3d at 503 (citing *Robinson,* 120 F.3d at 1302). The Court in *Krouse* cited *Jalil* as an example of a case where the timing of the retaliatory action (two days after the employee filed an EEOC complaint) was unusually suggestive. *See Krouse,* 126 F.3d at 503 (citing *Jalil,* 873 F.2d at 708).

 PLC discharged Farrell approximately three to four weeks after she rejected DeLong's advance. A temporal proximity of three to four weeks may support an inference of retaliation. However, more than temporal proximity alone is required to establish a causal connection between the protected activity and the adverse employment action. *See Bowles v. City of Camden,* 993 F.Supp. 255, 264 (D.N.J.1998) (holding that in addition to temporal proximity, plaintiff must show further evidence supporting a causal connection). Relying on the Third Circuit's recent holding in *Robinson* and *Krouse,* this Court finds that the timing of Farrell's discharge is not "unusually suggestive of retaliatory motive". *Krouse,* 126 F.3d at 503 (citing *Robinson,* 120 F.3d at 1302). There is no evidence that PLC's decision to terminate Farrell followed immediately after she rejected DeLong's advances. Therefore, "this is not one of the extraordinary cases where the plaintiff can demonstrate causation simply by pointing to the timing of the allegedly retaliatory action." *Robinson,* 120 F.3d at 1302.

 However, temporal proximity in addition to other evidence of discrimination may establish the required causal link between the protected activity and the adverse employment action. "Where there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference" that the employee's protected activity was likely the reason for the adverse employment action. *Kachmar,* 109 F.3d at 177 (emphasis in original). The Courts will look to the intervening period between the protected activity and the adverse action for other evidence of retaliatory animus. *Krouse,* 126 F.3d at 503–04.

Here, Farrell did not offer any evidence that suggests that PLC's decision to terminate her employment was linked to her rejection of DeLong's sexual advance. Farrell has not produced evidence of a "pattern of antagonism" or of "retaliatory animus" that would give rise to an inference of retaliation. *See Kachmar,* 109 F.3d at 177; *Krouse,* 126 F.3d at 503–04. Absent evidence of intervening antagonism or retaliatory animus, this Court finds that Farrell has failed to establish a causal link between her rejection of DeLong's advance and her termination. Thus, Farrell has not established a prima facie case of retaliation. Accordingly, Defendants' motion for summary judgment on each of the retaliation claims is granted.

### Breach of Employment Agreement

 Farrell asserts that PLC discharged her without cause in breach of an implied employment contract.

The parties have stipulated that North Carolina law applies to Farrell's breach of contract claim because that is where the parties entered into and performed the employment contract. Farrell's claim is based on oral assurances she allegedly received from PLC that she would only be terminated for poor performance.

The Supreme Court of North Carolina recently addressed such a claim in a case with similar facts. *See Kurtzman v. Applied Analytical Indus., Inc.,* 347 N.C. 329, 493 S.E.2d 420 (1997). Kurtzman worked as a sales manager for a company in Rhode Island. *Id.* 493 S.E.2d at 421. The defendant

company recruited Kurtzman for a position as a director of sales in Wilmington, North Carolina. *Id.* After the company offered him the position, but before he accepted it, Kurtzman inquired into the security of his position with the company. *Id.* Defendant's agents told Kurtzman the following: "If you do your job, you'll have a job"; "This is a long-term growth opportunity for you"; and "We're offering you a career position." *Id.* Kurtzman accepted the position, sold his home in Massachusetts and moved to Wilmington with his wife and daughter. *Id.* Seven months later, the company fired him. *Id.*

Kurtzman sued for breach of contract. He argued that under North Carolina law, the additional consideration of his moving to Wilmington and the company's specific assurances of continued employment created an exception to the employment at-will presumption and created an employment contract which could not be terminated without cause. *Id.* 493 S.E.2d at 421–22. He based his argument on opinions issued by the Court of Appeals of North Carolina. *Id.*

The Supreme Court of North Carolina dismissed Kurtzman's claim and held that in the absence of an employment contract "establishing a definite term of employment, the [employment] relationship is presumed to be terminable at the will of either party without regard to the quality of performance of either party." *Id.* 493 S.E.2d at 422 (citations omitted). The Court added that the company's assurances that Kurtzman would not be discharged so long as his performance was satisfactory and his relocation of residence to accept employment was insufficient to make his indefinite hiring terminable only for cause. *Id.* 493 S.E.2d at 422–23. The Court stated:

> The society to which the employment-at-will doctrine currently applies is a highly mobile one in which relocation to accept new employment is common. To remove an employment relationship from the at-will presumption upon an employee's change of residence, coupled with vague assurances of continued employment, would substantially erode the rule and

> bring considerable instability into an otherwise largely clear area of the law.

*Id.* 493 S.E.2d at 423.

*Kurtzman* was decided after Farrell's discharge. Farrell argues that *Kurtzman* should not be applied retroactively to bar her breach of contract claim because she had acquired vested contract rights in 1994 when she accepted employment at PLC, years before *Kurtzman* was decided.

The Supreme Court of North Carolina has held that changes in the law will generally be given retroactive effect, absent compelling reasons for prospective application. *Cox v. Haworth,* 304 N.C. 571, 284 S.E.2d 322, 324 (N.C.1981). One such compelling reason is where the previous law created vested contract rights. Thus, "[w]hen the law has received a given construction by a court of last resort, and contracts have been made and rights acquired under and in accord with such construction, such contracts may not be invalidated nor vested rights acquired under them impaired by a change of construction made by a subsequent decision." *MacDonald v. University of North Carolina,* 299 N.C. 457, 263 S.E.2d 578, 581–82 (1980) (citations omitted).

Farrell argues that prior to *Kurtzman,* the law in North Carolina held that an employee who relocated to accept employment with the defendant-employer and who also received assurances of employment for as long as performance was satisfactory, would have an enforceable employment contract to which the at-will doctrine did not apply. Thus, Farrell argues, *Kurtzman* cannot be applied retroactively to deprive her of the vested rights she obtained in 1994 and upon which she relied in accepting employment at PLC. This Court disagrees.

This case does not present a compelling circumstance for prospective application. First, prior to *Kurtzman,* the Supreme Court of North Carolina (a court of last resort) had never addressed the asserted relocation exception to the employment-at-will rule. *See Kurtzman,* 493 S.E.2d at 423 ("This Court has not heretofore expressly passed upon [the relocation exception]."). Second, a relocation exception to the at-will doctrine was not well-established law in North Carolina

prior to *Kurtzman.* In fact, Kurtzman argued that the relocation exception was well-established in North Carolina, but the Court disagreed. *Id.* 493 S.E.2d at 422. Third and most significantly, the *Kurtzman* Court applied its decision retroactively. The alleged employment contract in *Kurtzman* was made in March 1992, five years before the case reached the Supreme Court. *Id.* 493 S.E.2d at 421. Nevertheless, the Court applied its decision retroactively and dismissed Kurtzman's claim. *Id.* 493 S.E.2d at 424. The fact that the Court declined to apply the decision prospectively is a clear indication that it intended the decision to apply retroactively.

Under the ruling of the Supreme Court of North Carolina in *Kurtzman,* Farrell's breach of contract claim must fail. The oral assurances Farrell alludes to in order to support her claim are not viable.[38] There are no genuine issues as to any material facts, thus, Defendants' motion for summary judgment as to this claim is granted as a matter of law.

## CONCLUSION

Since the Court has dismissed all of Farrell's claims as a matter of law, Farrell's cross-motion to compel discovery and to preclude evidence withheld by Defendants; Defendants' motion appealing Magistrate Judge Haneke's February 19, 1998 order denying their motion to compel discovery; and Defendants' motion appealing Magistrate Judge Haneke's May 27, 1998 rulings with respect to the pretrial order are all denied as moot.

---

**38.** It is noteworthy that PLC's employee handbook contained a disclaimer providing that employment is at-will. *See* Eckenroth Aff., Ex. C.